IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 17, 2000, Session

## STATE OF TENNESSEE  v. WILLIAM DONALD ELLIS

**Direct Appeal from the Criminal Court for Sumner County**
**No. 10385     Jane Wheatcraft, Judge**

---

**No. M1999-783-CCA-R3-CD - Filed October 13, 2000**

---

The appellant, William Donald Ellis, was convicted by a Sumner County jury of one count of rape of a child, two counts of aggravated sexual battery, and two counts of assault.  The trial court imposed a sentence of twenty-five (25) years incarceration in the Tennessee Department of Correction for the offense of rape of a child, ten (10) years incarceration in the Department for each count of aggravated sexual battery, and six (6) months incarceration in the Sumner County Jail for each count of assault.  The trial court ordered that the appellant serve his sentences for rape of a child and aggravated sexual battery consecutively to each other and concurrently with his sentences for assault, resulting in an effective sentence of forty-five (45) years incarceration.  On appeal, the appellant presents the following issues for our review: (1) whether the trial court erred in denying his motion to suppress evidence obtained by police as a result of the warrantless search of his home; (2) whether the trial court should have required the State to elect between Counts One and Six of the indictment; (3) whether the evidence adduced at trial supports the jury's findings of venue; and (4) whether the evidence adduced at trial supports the jury's verdict of guilt of rape of a child. Following a review of the record and the parties' briefs, we affirm in part and reverse and remand in part the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part and Reversed and Remanded in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Brent O. Horst, Nashville, Tennessee, for the appellant, William Donald Ellis.

Paul G. Summers, Attorney General and Reporter, Russell S. Baldwin, Assistant Attorney General, Lawrence Ray Whitley, District Attorney General, and Sallie W. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I.  Factual Background

The appellant's convictions of rape of a child, aggravated sexual battery, and assault arose from the thirty-two year-old appellant's illicit relationship with AP,[1] a nine-year-old child whom the appellant was babysitting. The evidence adduced at the appellant's trial established that the appellant, his wife, and their two children moved to Gallatin, Tennessee in August of 1996. They lived in a trailer park at 540 North Water Street in Gallatin. Melody Ellis, the appellant's wife, obtained employment at a BP gas station in nearby Hermitage and worked five days each week from 9:00 p.m. until 6:00 a.m. The appellant, although initially employed, ultimately chose to remain at home and care for the children. Other children residing in the trailer park, including AP, frequently visited the Ellis home and played with the Ellis children. Indeed, when AP's family moved away from the trailer park, AP stayed at the Ellis home during the transition and thereafter continued to visit the Ellises overnight.

At trial, the appellant's wife recalled that, during AP's frequent stays at the Ellis home, the appellant was "overprotective" of AP. Ms. Ellis also recalled that the appellant frequently took AP to the park, roller skating, or swimming and left their own children at home. Moreover, when she returned home from work, Ms. Ellis would frequently find the appellant sleeping in bed with both their daughter and AP.

Ms. Ellis additionally recounted at trial a specific occasion on which she found a cup of oil containing pubic hair and drops of blood in one of the bathrooms in the Ellises' trailer. When she questioned her husband concerning the cup of oil, he denied any knowledge of the source of the cup, merely remarking that he had previously seen the cup in the bathroom. Ms. Ellis also discovered a pair of underwear, which she believed belonged to AP, stuffed underneath her daughter's mattress. Assuming that AP had had "a little accident," Ms. Ellis washed the underwear. On yet another occasion, Ms. Ellis noticed that a cream that she used to treat vaginal yeast infections had been removed from her bathroom. When she questioned her husband concerning the cream, he responded that AP "had a scratch on what he called her twinkie."

Ann Valliancourt, the Ellises' neighbor, testified at the appellant's trial that, in April of 1997, she was looking out the window of her trailer and observed the appellant and AP on a trampoline located between her trailer and the Ellises' trailer. Valliancourt recalled:

> [AP] . . . was jumping, and Billy [the appellant] was standing still. . . . [AP] would jump in Billy's arms and wrap her legs around there, and he would have his hand in her private areas . . . . He French kissed her.

Valliancourt also overheard the appellant telling AP that he loved her. Accordingly, Valliancourt immediately called the Department of Children's Services (DCS).

Valliancourt's report prompted an investigation by both DCS and the Gallatin Police Department. During this investigation, Detective Susan Morrow of the Gallatin Police Department interviewed the appellant, Ms. Ellis, and AP. Following these interviews, Morrow concluded that

---

[1]In accordance with this court's policy, we refer to the child victim by her initials.

there was insufficient evidence to sustain criminal charges. However, she instructed the appellant that he was to have no further contact with AP. AP's mother was similarly instructed to ensure that the appellant and AP had no further contact.

Following this investigation, the appellant wrote a letter to AP's mother in which he professed his love and caring for AP. The letter included the following remarks:

> Everyone knows I love [AP] . . . . Some are just jealous because they don't get as much love and attention as her, but they sometimes lie and steal or talk behind my back. . . . [AP] doesn't do this. She is really a true friend.
>
> My love for . . . [AP] didn't happen all at once. It was a bond between two friends that grew each day. At first . . . [AP] seemed like a crybaby, a spoiled rotten brat that wouldn't listen to anyone. But each day she listened to me, and I found out how smart and good-hearted-person she could be. Very funny, too. I began to see this girl was starting to adjust, and Melody mellowed down a little more each day. I've taught her a lot, and she is really trying so hard to be a good kid. I'm so proud of her for her efforts. I love . . . [AP] because she makes me happy. When she's around, life's not so boring after all. There are lots of things we have in common. We like the same music, food, clothes, places to go, and people to see and act or whatever. I am protective of . . . [AP] just as a dad is worried about his child having sex, getting pregnant or raped, kidnapped, or in fights with other kids, even though she is not my own. I am like this because she could be gone tomorrow forever, and that's my biggest fear. . . . [AP] and I are best friends because we do so much together as a team. We have a great deal of respect for each other. I'll always be there for her, and she's always there for me.
>
> * * *
>
> We need to be around each other all the time because we both need lots of love and attention, hugs, and kisses. . . . I'll always be a dad to her. She'll always be my baby.

The appellant also attempted to visit AP at her home. Ultimately, notwithstanding the disturbing tenor of the above letter, allegations that the appellant had sexually abused her daughter, and instructions from investigators to keep her daughter away from the appellant, AP's mother permitted her daughter to resume her visits to the Ellis home.

At this point, the appellant's relationship with his wife deteriorated, and, in early June 1997, Ms. Ellis temporarily left the Ellises' trailer and resided for several days with her ex-husband and his mother. On June 3, Ms. Ellis returned to the trailer, intending to remain in the trailer and restore her marriage. Upon her return, she learned that two of the Ellises' friends were visiting for several days and that AP was also present. Ms. Ellis asked the appellant why AP was present in their

home, and the appellant responded, "Because I want her here." Ms. Ellis offered to drive AP home en route to work. However, the appellant responded that he would kill Ms. Ellis if she attempted to remove AP from their home. Accordingly, Ms. Ellis departed for work alone.

Prior to departing for work, Ms. Ellis spoke with the friends who were currently visiting the Ellises' trailer. As a result of this conversation, Ms. Ellis left work early on June 4 and drove to the Ellises' trailer at approximately 5:45 a.m. When she arrived at the trailer, the visiting friends passed the Ellises' children to Ms. Ellis through a window of the trailer. Ms. Ellis then drove her children to a location in Lebanon before returning to Gallatin and visiting the Gallatin Police Department. At the police department, Ms. Ellis informed Detective Morrow that the appellant and AP were currently inside the Ellises' trailer. Additionally, she gave to the detective the key to the trailer and permission to search the trailer.

Morrow, accompanied by Lieutenant Dennis Thrasher of the Gallatin Police Department, immediately drove to the Ellises' trailer. When they arrived, they knocked on the front door but received no response. Accordingly, Morrow used the key provided by Ms. Ellis to unlock the door. As the officers entered the trailer, they continued to announce their presence. When they approached the master bedroom, Morrow observed the appellant through the open bedroom door. She recalled that the appellant was partially on the bed, his

> head and upper torso . . . [were] underneath the covers, and he was scooting out backwards. His feet were on the floor and at the same time he was bent over, and he was pulling his pants up over his hips at the same time he was pulling his upper torso out from under the covers.
>
> * * *
>
> At that point, I observed . . . [AP] in the bed. When I walked into the room, she immediately started crying.
>
> * * *
>
> I asked her if Mr. Ellis had done anything, and she told me that he was trying to make her come.

According to Morrow, AP was wearing a t-shirt but was nude below the waist. AP asked if she could dress herself and, upon receiving permission, obtained a pair of underwear and a pair of shorts from a pile of discarded clothing beside the bed. The police additionally recovered a bottle of suntan oil from the bed and a pair of "[l]ittle girl's Hanes" underwear from one of the bathrooms.

AP was immediately transported to Our Kids Center, a division of the Metropolitan Nashville General Hospital. Lisa Dupree, an employee of the Center, conducted the initial medical interview of AP. According to Dupree, the victim

> reported that she had been touched on her front private. At that point, she pointed to her vaginal area. Said she had been touched with a hand and with a private and that it happened more than one time. She also reported, and I did ask her specifically about the time frame, particularly that day, she reported that on that day she had been

-4-

touched on her front private with a hand and a private and that she was afraid she had done something wrong and she was in trouble and going to be taken away from her mother.

* * *

Said that the person that had done this told her that he wanted her to help him come. She reported that she did not know what that meant when that was said to her, that that was just what she was always told happened.

Following the initial medical interview, Julie Rosof-Williams, a family nurse practitioner, performed the physical examination of AP. At trial, Rosof-Williams described the results of her examination:

> [The victim] was a healthy child. Her non-genital and anal portion - - eye, ears, nose part - - she is a healthy child. When I examined the genital area, she was cooperative. . . . [S]he had a healthy external, normal looking genitalia. When I separated the labia majora, I was able to see further inside and checked the general structures. One of these structures is the hymen. If you think of the vagina as a pocket where tampons go, that is actually the vagina. The hymen is just inside the vagina, and that partially covers the opening. She had two tears in the opening.

Rosof-Williams opined that the tears in AP's hymen had occurred at least three to six days prior to the examination. However, she affirmed that the tears reflected penetration of the child's vagina at sometime in the past.

The nurse practitioner also testified that the victim had previously been examined by the Center in 1992 for evidence of sexual abuse by a suspect other than the appellant. At that time, there were similar tears in AP's hymen. Rosof-Williams opined that the injuries she observed on June 4, 1997, could have been the same as those observed in 1992. She also noted that, because AP's hymen was torn in 1992, subsequent penetration would be less likely to cause injury. Indeed, during the 1997 examination, AP denied any injuries causing bleeding. Finally, Rosof-Williams recalled that, in 1997, the victim did have a small amount of pubic hair.

Shelley Betts, a forensic scientist with the Tennessee Bureau of Investigation and an expert in serology and DNA analysis, examined vaginal and rectal swabs obtained from AP during her examination by Rosof-Williams. Although Betts was unable to find any semen on the rectal swabs, she did identify the presence of sperm cells on the vaginal swabs. However, there was an insufficient quantity of sperm cells to perform a DNA analysis. The agent also examined the Hanes underwear seized by the police from the bathroom in the Ellises' trailer. She identified the presence of semen and other bodily fluids on the underwear. A DNA analysis of the semen revealed a DNA profile consistent with the appellant's DNA profile. The agent noted that one in every twenty thousand Caucasians would possess the appellant's DNA profile. A DNA analysis of the remaining bodily fluids on the underwear revealed a profile consistent with AP's profile.

Detective Morrow interviewed the appellant on June 4, 1997, the day of his arrest. The detective recalled that, initially, the appellant was extremely agitated and demanded to know who had submitted a complaint to the police. Additionally, he denied engaging in any sexual activity with AP. Indeed, the appellant denied that the police had found him in bed with AP. Subsequently, however, the appellant made the following admissions:

> He admitted to having sex with . . . [AP]. He stated that he had digitally penetrated her with his finger, that he was - - loved her, and that he did what she wanted him to do. She did this willingly, that he did not rape her. To him, raping was actually putting his penis inside her vagina. He says that he would take the oil and he would rub it on his penis, and then he would get in between . . . [AP's] legs and rub up and down. He said he would do this also to - - in between her buttocks in the same fashion as he did in the front.
>
> * * *
>
> He said he did this about 20 to 30 times.
>
> * * *
>
> He said he was unhappy in his marriage and that he cared for . . . [AP].
>
> * * *
>
> He stated that [AP] had performed oral sex and that - - on him and that he would perform oral sex on her as well.
>
> * * *
>
> He said she would wear short shorts, that she would get up in his lap, and that she would scoot around on his groin area . . . .

Following her interview with the appellant, Morrow instructed Sergeant Gregory Allen Bunch to transport the appellant to Sumner Regional Medical Center for a blood test. En route to the medical center, the appellant volunteered several statements to the sergeant. Specifically, the appellant again denied the use of any force in pursuing his relationship with AP and also denied any penile penetration of AP's vagina, commenting, "She couldn't handle all that I have." He admitted that, on June 4, he had fondled AP's genitals. He further admitted that he and AP had previously engaged in oral intercourse. He specifically noted that AP had previously performed oral sex upon him. Finally, the appellant attempted to explain to the sergeant why he had initiated a sexual relationship with AP:

> [I]t happened one night on the couch. [AP] came over and wanted me to kiss her and she, we were laying next to each other on the couch and she would stick her butt out in my crotch, you know, rub up against it and stuff like. Of course, the girl's got a pretty body and everything, she's not a woman or anything but she's real close and you know like they say a hard dick has no fear and you know, things happened. I couldn't stop it, you know it just . . . .

-6-

Subsequently, the appellant also wrote two letters to his wife in which he again effectively confessed to a sexual relationship with AP. For example, in a letter dated June 8, 1997, the appellant wrote to his wife that his sister "will be going to court with me to testify how . . . [AP] was all over me all the time. She came on to me and she knows what she was doing. . . . I never did penetrate her at any time, I swear. Please be on my side in court." Moreover, in a June 10, 1997 letter to his wife, the appellant reiterated the account, previously communicated to Sergeant Bunch, of his first sexual encounter with AP. In the same letter, the appellant described the following, additional encounter: "One night when I was on the couch with a blanket over me, . . . [AP] got under the blanket and gave me a blow job."

A Sumner County Grand Jury returned a sixty-one-count indictment against the appellant. On April 13, 1999, immediately prior to the appellant's trial, the State requested and the trial court granted the entry of an order of nolle prosequi for all but four counts of rape of a child, one count of attempted rape of a child, and two counts of aggravated sexual battery. The trial court further dismissed one of the remaining counts of rape of a child before submitting the charges to the jury for deliberation. In defense against those charges, the appellant testified on his own behalf at trial. Specifically, he recanted both his statements to the police and to his wife and denied any sexual or otherwise inappropriate relationship with AP. At the conclusion of the trial, the jury acquitted the appellant of one count of rape of a child, and returned verdicts of guilt of one count of rape of a child, two counts of aggravated sexual battery, and two counts of assault. The trial court imposed a sentence of twenty-five (25) years incarceration in the Tennessee Department of Correction for the offense of rape of a child, ten (10) years incarceration in the Department for each count of aggravated sexual battery, and six (6) months incarceration in the Sumner County Jail for each count of assault. The trial court further ordered that the appellant serve his sentences for rape of a child and aggravated sexual battery consecutively to each other and concurrently with his sentences for assault, resulting in an effective sentence of forty-five (45) years incarceration.

## II. Analysis
**a.      Trial Court's Denial of Appellant's Motion to Suppress**

In this appeal as of right, the appellant first argues that the trial court erred in denying his motion to suppress any evidence obtained as a result of the warrantless search of the Ellises' trailer, challenging the State's reliance upon Ms. Ellis' consent to the search. Under both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution, a warrantless search of a person's home is presumed unreasonable unless the search falls within one of the narrowly defined exceptions to the warrant requirement. State v. Bartram, 925 S.W.2d 227, 229-230 (Tenn. 1996)(citing Coolidge v. New Hampshire, 403 U.S. 443, 454-455, 91 S. Ct. 2022, 2032 (1971)); see also State v. Horn, No. 03C01-9810-CR-00363, 2000 WL 122240, at *3 (Tenn. Crim. App. at Knoxville, January 26, 2000). A well-settled exception to the warrant requirement is a search conducted pursuant to a voluntary and intelligent consent either by the individual whose property is searched, Bartram, 925 S.W.2d at 230 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045 (1973)), or by a third party who possesses common authority over the premises, id. at 230-231 (citing United States v. Matlock, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974)). The State has the burden of establishing that the search was conducted pursuant to this

exception.  Id.  If the State fails to satisfy its burden, the exclusionary rule may operate to bar the admissibility of any evidence obtained directly or derivatively from the unconstitutional search. Wong Sun v. United States, 371 U.S. 471, 485, 83 S. Ct. 407, 416 (1963); State v. Clark, 844 S.W.2d 597, 600 (Tenn. 1992).

The trial court conducted a suppression hearing in this case on February 5, 1998.  At the suppression hearing, the appellant did not dispute that Ms. Ellis voluntarily and intelligently consented to the search of the Ellis home, and he does not dispute the voluntary and intelligent nature of her consent on appeal.  Rather, he disputes her authority to consent to the search.  The trial court concluded that, in fact, Ms. Ellis possessed common authority over the Ellises' trailer.  We review this determination de novo as it involves mixed questions of law and fact.  See, e.g., State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)("Cases that involve mixed questions of law and fact are subject to de novo review."); see also United States v. Gevedon, 214 F.3d 807, 810 (7th Cir. 2000); United States v. Salimonu, 182 F.3d 63, 70 (1st Cir. 1999); United States v. Kim, 105 F.3d 1579, 1581 (9th Cir. 1997).  Our de novo review is not limited to the record of the suppression hearing but extends to the entire record of proceedings, including, in this case, the appellant's trial.  State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Matlock, the United States Supreme Court defined the "common authority" necessary to validate a third party's consent to a warrantless search:

> The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 171 n.7, 94 S. Ct. at 993 n. 7.  The State may satisfy its burden of proof in this regard either by demonstrating that the third party in fact possessed common authority as defined above or, alternatively, by demonstrating that the facts available to the searching police officers would have warranted ""'a man of reasonable caution in the belief"' that the consenting party had authority over the premises."  Illinois v. Rodriguez, 497 U.S. 177, 188-189, 110 S. Ct. 2793, 2801 (1990)(citation omitted); United States v. Chaidez, 919 F.2d 1193, 1201-1202 (7th Cir. 1990); see also Clark, 844 S.W.2d at 599 n. 1; State v. Seaton, No. 03C01-9701-CC-00040, 1998 WL 915903, at *3 (Tenn. Crim. App. at Knoxville, November 18, 1998), perm. to appeal dismissed, (Tenn. 1999).

In this case, Ms. Ellis was married to the appellant and, with the exception of a brief, three- or four-day separation, had been residing with the appellant in the trailer until only hours before her interview with Detective Morrow and her consent to the search of the trailer.  The record reflects that, unbeknownst to the appellant, Ms. Ellis collected her children and left the trailer due to the appellant's aberrant behavior, and she and her children were "in Lebanon in hiding" at the time of her consent.  She retained the keys to the trailer, and the circumstances of her departure overwhelmingly, albeit circumstantially, suggest that a substantial portion of her property remained

-8-

inside the Ellis trailer. Moreover, while these facts are not dispositive, we note that Ms. Ellis rather than the appellant was the title owner of the trailer, and her name rather than the appellant's was listed on the rental agreement for the property on which the trailer was located. The record also indicates that, as the sole source of income in the Ellis family, Ms. Ellis was paying the rent for the property. Finally, following the appellant's arrest, Ms. Ellis continued to reside in the trailer. We conclude that these facts established Ms. Ellis' "common authority" over the trailer. Cf. United States v. Trzaska, 859 F.2d 1118, 1120 (2d Cir. 1988); United States v. Long, 524 F.2d 660, 661 (9th Cir. 1975); Smiley v. State, 606 So.2d 213, 214-217 (Ala. App. 1992); State v. Ratley, 827 P.2d 78, 80-82 (Kan. App. 1992); State v. Madrid, 574 P.2d 594, 596-597 (N.M. App. 1978); Sullivan v. State, 716 P.2d 684, 686-687 (Okla. App. 1986).

The appellant additionally argues that, even assuming his wife's "common authority" over the trailer, her consent did not justify the warrantless search because of the appellant's presence in the trailer at the time of the search. In support of his argument, the appellant cites the following language in Matlock, 415 U.S. at 170, 94 S. Ct. at 993 (emphasis added):

> [R]ecent authority clearly indicates that the consent of one who possesses common authority over premises or effects is valid as against the *absent*, nonconsenting person with whom that authority is shared.

Of course, in the instant case, the police did knock on the front door of the Ellis' trailer and only entered upon receiving no response. Moreover, they unavailingly continued to announce their presence as they entered the trailer and walked toward the master bedroom. In any event, we note that the facts of Matlock do not support the appellant's narrow interpretation of the above language. The defendant in Matlock was being arrested in his front yard at the time his girlfriend consented to the search of his home. Id. at 166, 991. Notwithstanding the failure of police to obtain the defendant's consent, the Court concluded that the girlfriend's consent authorized the warrantless search of the home. Id. at 177, 996. Moreover, many courts interpreting Matlock have declined to limit its application to searches occurring in the defendant's absence. See, e.g., United States v. Morning, 64 F.3d 531, 534-536 (9th Cir. 1995), and cases cited therein. This issue is without merit.

**b.      Counts One and Six**

The appellant also argues that the trial court erred in failing to require the State to "elect" between Counts One and Six of the indictment because the State relied upon the same facts to establish both counts. In order to address both this contention and the arguments that follow, we must review the State's election of the specific incidents upon which it chose to proceed for each count of the indictment.

The State made its election of offenses during its closing argument.[2]  For Count One, charging the appellant with aggravated sexual battery and underlying the appellant's conviction of the same offense, the State relied upon the appellant's statement to Detective Morrow that he had previously rubbed his penis against AP's vagina twenty or thirty times and AP's statement to Lisa Dupree confirming that, on several occasions including June 4, 1997, she had been touched "on her front private with . . . a private."

For Count Two, charging the appellant with aggravated sexual battery and underlying the appellant's conviction of assault, the State relied upon the appellant's statements to Sergeant Bunch and to his wife concerning his first sexual encounter with AP "on the couch," during which she rubbed her bottom against his genitalia, and he experienced an erection.

For Count 4,[3] charging the appellant with rape of a child and underlying his conviction of the same offense, the State relied upon the appellant's statement to his wife concerning another encounter with AP "on the couch" during which AP performed oral sex on the appellant. The State also noted that this statement was consistent with the appellant's statements to Morrow and Bunch that AP had performed oral sex upon him.

For Count 5, charging the appellant with rape of a child and underlying his conviction of assault, the State relied upon the appellant's statement to Morrow that, on June 4, 1997, he penetrated AP's vagina with his finger, the appellant's more limited admission to Bunch that he had only fondled AP's genitalia on that occasion, and AP's statement to Dupree that, on June 4, 1997, she had been touched on her "front private" with a hand.

Finally, for Count Six, charging the appellant with attempted rape of a child and underlying the appellant's conviction of aggravated sexual battery, the State again relied upon AP's statement to Dupree that, on June 4, 1997, she was touched "on her front private with . . . a private" and the appellant's oblique statement to Bunch that "[AP] couldn't handle all that I have." The State additionally noted the discovery of semen in AP's vagina on June 4, and the presence of the appellant's semen along with AP's bodily fluids on a pair of underwear recovered from a bathroom in the Ellises' trailer on June 4.

---

[2]Interestingly, the prosecutor remarked at the appellant's trial that she had "elected" offenses immediately prior to trial by reducing the number of counts in the indictment.  Reducing the number of counts in an indictment in no way resolves the election problem when there are insufficient remaining counts to accommodate all of the offenses shown by the evidence.  Indeed, the prosecutor's remark was belied by her tacit acknowledgment during closing argument of the need to further identify the event underlying each remaining count.

The State's election of offenses during its closing argument rather than at the close of its case-in-chief did not satisfy the requirements of Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973).  See also State v. Leath, No. 01C01-9511-CC-00392, 1998 WL 315957, at *7 (Tenn. Crim. App. at Nashville, June 17, 1998).  Nevertheless, we conclude that any error in the *timing* of the State's election was harmless.

[3]The jury returned a verdict of "not guilty" for Count Three of the indictment, charging the appellant with rape of a child.

-10-

Preliminarily, we note that the difficulty in distinguishing between Counts One and Six of the indictment stems from the State's failure to relate Count One to a specific event for which it was asking the jury to return a guilty verdict. When an indictment charges that a number of sexual offenses occurred over a span of time, the State may introduce evidence of any unlawful sexual contact between the defendant and the victim allegedly occurring during that span of time. State v. Rickman, 876 S.W.2d 824, 828-829 (Tenn. 1994); see also State v. Hambrick, No. E1998-0893-CCA-R3-CD, 2000 WL 823467, at *5 (Tenn. Crim. App. at Knoxville, June 27, 2000). However, at the conclusion of its case-in-chief, the State must elect the particular incident for which a conviction is being sought. Id. This requirement of election serves several purposes: (1) it enables the defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). The supreme court has noted that a defendant's right under our state constitution to a unanimous jury verdict is the most serious concern. State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993). Moreover, because the election requirement is "fundamental, immediately touching the constitutional rights of an accused," a trial court has a duty even absent a request by the defendant to ensure the timely election of offenses by the State and to properly instruct the jury concerning the requirement of a unanimous verdict. Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973).[4]

Recognizing the practical difficulties present in applying the election requirement in cases of child sexual abuse, our supreme court has further provided the following broad guidelines:

> By insisting upon election, we emphasize that the state is not required to identify the particular date of the chosen offense. . . . If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. . . . Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. . . . Any description that will identify the prosecuted offense for the jury is sufficient. In fulfilling its obligation under Burlison to ensure that an election occurs, the trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision.

Shelton, 851 S.W.2d at 137-138 (citation and footnote omitted).

---

[4]The appellant in this case has failed to include the jury instructions in the record before this court. Tenn. R. App. P. 24(b).

Again, with respect to Count One of the indictment, the State relied upon both the victim's and the appellant's statements concerning multiple incidents during which the appellant rubbed his penis against AP's vagina. In State v. Brown, 823 S.W.2d 576, 584 (Tenn. Crim. App. 1991), we did observe that

> [i]n a case where the evidence shows that the defense is, simply, a denial that any offense occurred and that the evidence in favor of the state's position is of a similar quality as to each offense proven and is derived from the same witness [es], then it is extremely difficult to imagine that a potential exists of the jury splitting its findings.

Nevertheless, our supreme court cast doubt upon this observation in Tidwell, 922 S.W.2d 497, 501 (Tenn. 1996), when it specifically rejected the State's argument that, when a victim is unable to recount any specifics about multiple incidents of abuse except that the defendant engaged her in sexual intercourse on numerous occasions, "'jury unanimity is attained . . . because, although the jury may not be able to distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described.'" See also e.g., State v. Thomason, No. W1999-02000-CCA-R3-CD, 2000 WL 298695, at *10 (Tenn. Crim. App. at Jackson, March 7, 2000)(holding that the State did not sufficiently elect an offense upon which to base a conviction of sexual battery when the victim testified concerning multiple incidents in 1995 when the defendant "touched [her] inappropriately" but could not recall any specific incident).

We acknowledge that the victim did specifically identify the June 4, 1997 incident, during which the appellant touched her vagina with his penis. This court has previously observed that harmless error analysis may be appropriate when a victim specifically identifies one incident of sexual abuse and testifies generally about other instances. See, e.g., Shelton, 851 S.W.2d at 138; see also State v. Young, No. 01C01-9605-CC-00208, 1998 WL 258466, at *6 (Tenn. Crim. App. at Nashville, May 22, 1998). However, even assuming that harmless error analysis is appropriate in this case, we agree with the appellant that, if the State relied upon the June 4 incident to establish Count One of the indictment, then the appellant's convictions of Count One and Count Six violate principles of double jeopardy. The victim's statement to Lisa Dupree referred to only one act of sexual contact between the appellant's penis and her vagina on June 4, 1997. Although the appellant admitted that on twenty or thirty occasions in the past he had rubbed his penis against AP's vagina, he did not clarify the extent of his conduct on June 4. Moreover, the State did not adduce any testimony that the presence of the appellant's semen on AP's underwear and the presence of some unidentified semen in AP's vagina were inconsistent with or suggested anything other than a single act of such sexual contact on June 4. Finally, the appellant's statement to Sergeant Bunch that AP "couldn't handle all that I have" was ambiguous and likewise not inconsistent with a single act of sexual contact. In sum, due to the State's failure to elect the offense upon which it was relying to establish Count One of the indictment, the appellant may very well have been convicted twice of aggravated sexual battery based upon a single act that occurred on June 4, 1997. See State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996).

We emphasize in this regard that, contrary to the State's suggestion in its brief, we need not decide whether, assuming the appellant first rubbed his penis against AP's vagina and then

attempted to penetrate AP on June 4, 1997, this conduct would support two separate convictions. Cf., e.g., State v. Binion, 947 S.W.2d 867, 871-872 (Tenn. Crim. App. 1996). The jury clearly concluded that the appellant did not attempt to penetrate AP's vagina on June 4, and, once again, the evidence adduced at trial suggested a single incident of sexual contact between the appellant's penis and AP's vagina on June 4.

In conclusion, the appellant's conviction of aggravated sexual battery in Count One must be reversed due to the State's failure to elect the offense upon which it was relying and the obvious double jeopardy implications raised by the jury's possible reliance upon the June 4 incident to return guilty verdicts for both Count One and Count Six. The remedy for the State's failure to satisfy the election requirement is generally a new trial. Brown, 992 S.W.2d at 392. However, upon the appellant's retrial for Count One of the indictment, the State may not rely upon the June 4 incident.

**c.      Venue**

The appellant next asserts that, with respect to each of his convictions, the State failed to establish venue. As we have already determined that the appellant's conviction of aggravated sexual battery in Count One of the indictment must be reversed and remanded for a new trial, we only address the sufficiency of the evidence establishing venue with respect to the remaining counts.

Article I, § 9 of the Tennessee Constitution provides that, "in all criminal prosecutions, the accused hath the right to. . . a speedy public trial, by an impartial jury of the County in which the crime shall have been committed." This constitutional guarantee precludes a court from convicting a defendant for crimes committed outside the county in which the court is located. State v. Anderson, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997); State v. Hill, 847 S.W.2d 544, 545 (Tenn. Crim. App.1992); see also Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed."). Accordingly, in addition to proving a defendant's commission of an offense beyond a reasonable doubt, the State must prove venue by a preponderance of the evidence in order to obtain a conviction. Tenn. Code Ann. § 39-11-201(e) (1997). Slight evidence is enough to carry the prosecution's burden of proof if such evidence is uncontradicted. Ellis v. Carlton, 986 S.W.2d 600, 602 (Tenn. Crim. App. 1998); State v. Smith, 926 S.W.2d 267, 269 (Tenn. Crim. App. 1995). Moreover, this evidence may be either direct, circumstantial, or both. Anderson, 985 S.W.2d at 15; Smith, 926 S.W.2d at 269.

As the appellant himself acknowledges, Counts Five and Six of the indictment, underlying the appellant's convictions of assault and aggravated sexual battery, clearly relate to sexual activity that occurred between the appellant and AP in the Ellises' trailer on June 4, 1997, activity that was interrupted by the arrival of the police. Testimony at trial established that the Ellises' trailer is located at 540 North Water Street in Gallatin, Tennessee. While the State failed to adduce testimony that Gallatin is located within Sumner County, we note that the State did introduce into evidence the Ellises' "Final Decree of Divorce," reflecting the location of the Sumner County Chancery Court in Gallatin. Moreover, the record reveals no evidence or allegation that this

particular offense occurred in any other county. Finally, as correctly noted by the State, this court has previously interpreted Tenn. R. Evid. 201 to permit a jury, whether requested or not, to notice facts "generally known within the territorial jurisdiction of the trial court." State v. Walden, No. 03C01-9409-CR-00330, 1995 WL 506036, at *3 (Tenn. Crim. App. at Knoxville, August 24, 1995); see also State v. Smith, No. 03C01-9807-CR-00259, 1999 WL 619042, at *2 (Tenn. Crim. App. at Knoxville, August 17, 1999)(holding that, when the State's proof indicated that the drug transactions at issue took place in Athens, the jury could properly determine that Athens is in McMinn County and thereby find venue). As in Walden, the location of Gallatin in Sumner County cannot reasonably be disputed. Walden, No. 03C01-9409-CR-00330, 1995 WL 506036, at *3; cf. State v. Young, 617 S.W.2d 661, 663 (Tenn. Crim. App. 1981)(holding that the trial court erroneously took notice of the location of Johnson City in Washington County when, in fact, Johnson City was located in both Washington County and Carter County, and the location of particular streets is not subject to judicial notice). Accordingly, as in Walden, the jury in this case, comprised of citizens of Sumner County, could take notice of the location of the largest city in Sumner County. Walden, No. 03C01-9409-CR-00330, 1995 WL 506036, at *3. Finally, as in Walden, any deficiency in the trial court's instructions to the jury has been waived due to the appellant's failure to include the jury instructions in the record before this court. Id.[5]

As to Counts Two and Four of the indictment, underlying the appellant's convictions of assault and rape of a child, the appellant's statements to the police and to his wife reflect that the incidents elected by the State occurred "on the couch." More specifically, the appellant's June 10, 1997 letter to his wife indicates that both incidents occurred on the same couch. Additionally, we note that the appellant's reference to the "couch" in his statement to Sergeant Bunch immediately followed the appellant's observation that AP was residing with the Ellises "one night after another." The evidence adduced at trial established that AP periodically resided with the Ellises in their trailer in Gallatin, Tennessee. Indeed, the evidence established that, other than skating or swimming excursions or trips to the park, the appellant's encounters with AP, sexual or otherwise, occurred at the Ellises' trailer. Thus, we conclude that a preponderance of the evidence established that the incidents elected by the State for Counts Two and Four occurred in the Ellises' trailer in Gallatin, Tennessee. As previously noted, the jury could take notice of the location of Gallatin in Sumner County. This issue is without merit.

### d.    Sufficiency of the Evidence

---

[5]We note that our decision in Walden appears contrary to the plain language of Tenn. R. Evid. 201(c) which provides only that a *court*, rather than the trier of fact, "may take judicial notice whether requested or not." Moreover, prior to the adoption of the Tennessee Rules of Evidence, this court acknowledged in State v. Chadwick, 750 S.W.2d 161, 165 (Tenn. Crim. App. 1987), that a court may take judicial notice of the location of a city within a particular county but emphasized that, in that case, the record contained no indication that the trial judge had taken judicial notice of the location of the city at issue or that he had instructed the jury on that point. Of course, in this case, the record is incomplete. Accordingly, it is unclear whether the trial court took judicial notice of the location of Gallatin or instructed the jury in accordance with Tenn. R. Evid. 201(g). The incompleteness of the record inures to the appellant's detriment. Tenn. R. App. P. 24(b). Additionally, we note the general principle that "'[t]he jury may use their common knowledge and experience in deciding whether a fact is logically deducible from the circumstances in evidence, or in making reasonable inferences from the evidence.'" Fairbanks v. State, 508 S.W.2d 67, 69 (Tenn. 1974).

-14-

Finally, the appellant challenges the sufficiency of the evidence underlying his conviction of rape of a child in Count Four of the indictment. When the sufficiency of the evidence is challenged on appeal, our standard of review is whether any "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). In other words, the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359 (1999).

In order to prove the appellant's commission of the offense of rape of a child, the State was required to establish beyond a reasonable doubt that (1) the appellant engaged in sexual penetration of AP, or AP engaged in sexual penetration of the appellant; (2) AP was less than thirteen years of age; and (3) the appellant acted intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-13-522 (1997). The definition of "sexual penetration" includes fellatio. Tenn. Code Ann. § 39-13-501(7) (1997). Again, in a letter to his wife, the appellant described an incident in which AP, a nine year-old girl, performed oral sex, i.e., fellatio, upon him. He also admitted to Detective Morrow and Sergeant Bunch that AP had performed oral sex upon him. Nevertheless, the appellant now asserts that the State failed to establish the "corpus delicti" of the offense because the only evidence of the offense was the appellant's uncorroborated inculpatory statements. Specifically, the appellant argues that evidence of his ongoing sexual relationship with AP during the time period charged in the indictment was insufficient corroboration of his inculpatory statements.

"Corpus delicti" literally means the body of the crime. State v. Shepherd, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992); State v. Turner, No. E1999-00919-CCA-R3-CD, 2000 WL 92339, at *3 (Tenn. Crim. App. at Knoxville, January 28, 2000), perm. to appeal denied, (Tenn. 2000). In order to establish the corpus delicti of a crime, the State must establish beyond a reasonable doubt (1) that a certain result has been produced and (2) that some person is criminally responsible for the act. State v. Jones, 15 S.W.3d 880, 890-891 (Tenn. Crim. App. 1999); Turner, No. E1999-00919-CCA-R3-CD, 2000 WL 92339, at *3. The corpus delicti cannot be established by a confession alone. State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984); see also Smith, 24 S.W.3d at 281. That having been said, only slight evidence of the corpus delicti is necessary to corroborate a confession and thereby sustain a conviction. Id.; Jones, 15 S.W.3d at 891. Such corroborating evidence may be direct or circumstantial. Jones v. State, 601 S.W.2d 323, 325 (Tenn. Crim. App. 1980). In short, "'[the corroborating] evidence is sufficient if . . . it tends to connect the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little consideration.'" Smith, 24 S.W.3d at 281.

As noted previously, in <u>Rickman</u>, 876 S.W.2d 828-829, our supreme court reaffirmed the special rule "admitting evidence of other sex crimes when an indictment is not time specific and when the evidence relates to sex crimes that allegedly occurred during the time as charged in the indictment." In other words, the court reaffirmed that, under those limited circumstances,

> evidence of other . . . [sex crimes] both prior and subsequent to the act charged in the indictment is competent as tending to establish the commission of the special act under examination, as corroborative of the evidence of witnesses testifying thereto, and for the purpose of showing the relationship of the parties.

<u>Id.</u> at 828 (citations omitted); <u>see also</u> <u>State v. Hodge</u>, 989 S.W.2d 717, 722 (Tenn. Crim. App. 1998). Thus, in the instant case, independent evidence that the appellant engaged in various sexual acts with AP during the time period charged in the indictment corroborated his confessions to engaging in a specific act of oral intercourse with AP. Indeed, as correctly noted by the State, in the analogous context of evaluating the sufficiency of the evidence corroborating a statement by an accomplice, we have previously held that evidence of a continuing course of sexual conduct between the defendant and the victim-accomplice, occurring during the indictment period, adequately corroborated the victim-accomplice's testimony concerning specific incidents. <u>State v. Lawson</u>, No. 01C01-9607-CR-00320, 1997 WL 661483, at *6 (Tenn. Crim. App. at Nashville, October 24, 1997). We conclude that the record contains sufficient evidence corroborating the appellant's inculpatory statements. This issue is without merit.

### III. Conclusion

For the foregoing reasons, we reverse the appellant's conviction of aggravated sexual battery in Count One of the indictment and remand that case to the trial court for a new trial or other proceedings consistent with this opinion. We otherwise affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-16-