IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2007 Session

**STATE OF TENNESSEE v. ALEC JOSEPH MESOT**

**Appeal from the Circuit Court for Montgomery County**
**No. 40300726     John H. Gasaway, III, Judge**

---

**No.  M2006-02599-CCA-R3-CD - Filed March 14, 2008**

---

THOMAS T. WOODALL, J., concurring in part and dissenting in part.

I respectfully dissent from that portion of the majority opinion which reverses the convictions for rape of a child and dismisses those five counts of the indictment.

**I.  Facts**

The victim, a nineteen-month old girl, the Appellant, and Appellant's wife, Amanda Mesot, moved to Clarksville in May 2002.  No other persons resided in their home.  In December 2002, Ms. Mesot came home to find pictures on the family computer depicting "adults doing sexual things to children."  Ms. Mesot testified that the Appellant had a computer program which enabled him to download the child pornography from the internet.  On April 8, 2003, Ms. Mesot contacted the Clarksville police department. (Ms. Mesot did not testify at trial as to why there was a four month delay in contacting the police.)  The next day, April 9, 2003, Ms. Mesot called her parents who lived in Virginia and asked them to come to Clarksville and remove the victim from the home.  Ms. Mesot's  parents complied and the victim was taken back to Virginia with her grandparents.  Prior to the victim being taken to Virginia by her grandparents, she had been alone with Appellant approximately twice per week while Ms. Mesot was working.

After the initial report was made by Ms. Mesot to the Clarksville Police Department on April 8, 2003, Detective John Nichols of the Clarksville Police Department contacted Appellant and requested that Appellant come to the police department for an interview.  On April 21, 2003, Appellant arrived at the police department.  Detective Nichols advised Appellant of his Miranda rights and told him that he was free to leave at any time.  Appellant stated that he "didn't mind sitting there talking to [Detective Nichols] about the investigation."

According to Detective Nichols, he and Appellant talked for "quite a while."  Appellant "adamantly denied" that he had engaged in sexual acts with the victim.  Appellant "pounded the desk

-1-

a few times" and said that "[Appellant] wouldn't do that" and "just denied [sexual acts with the victim] the entire time" he was speaking to Detective Nichols. At some point during the interview on April 21, 2003, Detective Nichols asked if Appellant would voluntarily go to Memphis and talk to F.B.I. agents. Detective Nichols knew, but apparently did not convey to Appellant, that the F.B.I. agents in Memphis handled "crimes against children." Detective Nichols gave Appellant the name and telephone number of an F.B.I. agent in Memphis.

Appellant contacted F.B.I. Special Agent Stephen Lies by telephone and on May 12, 2003, Appellant and his wife took their computer and drove to the F.B.I. office in Memphis. According to Special Agent Lies, Appellant agreed to bring his computer because the computer was "part of the investigation with some incidents that happened on the computer." Appellant advised Special Agent Lies that he had "wiped" the images he had downloaded and thus "agreed to bring [the computer] down for us to review."

At the F.B.I. office, Appellant was advised of his Miranda rights and signed a waiver of those rights. Appellant was interviewed by Special Agent Lies and two other law enforcement officers for approximately two and one-half hours. During the interview, Appellant signed a consent to search his computer. On a "temporary internet file," five photographs of child pornography were found. All five images had been created on the Appellant's computer on May 8, 2003.

At the conclusion of the interview with the F.B.I on May 12, 2003, Appellant signed a typed statement stating:

> For almost a year and a half I have found myself struggling with a curiosity of sexual interaction with children. The first time I encountered the idea of incest was when I was in the military and visited a website called "incesttaboo.com." Approximately one year ago I built my computer. I got internet access around December 2002 with Charter Cable Modem service. I bought a webcam around January 2003. I accessed the Internet site "incesttaboo.com" which had several features to include posting of pictures, web chat, and video. I never posted any pictures of my daughter but saw many pictures and videos on the site that contained sexually explicit images of children. Around three weeks ago I was laying on the couch and had the computer and web cam connected to the incesttaboo site. I had accessed the web section of the site and came in contact with ******@hotmail.com [screen name omitted]. He kept pushing me to do things to her. I didn't want to but I ended up engaging in oral sex with her and also touching her genitals so he could watch on the web cam. I really struggled with this and did not take any pictures or movies of what happened. I want this all to end and I never was violent or abusive to my daughter. In being truthful I did have other occasions where my daughter would take off her daughter [sic] and would want me to take my pants off. She would play with my genitals and I would have oral sex with her. I would always stop when she wanted and never tried to put my penis inside her because I knew it would hurt her. I was physically abused when I was younger and I am trying to deal with

my wife's abuse to me and my daughter. I only had any contact with my daughter when she wanted it. I want to get counseling for me and my family so we can stay together.

Appellant was allowed to leave the F.B.I office after the interview concluded, and he and Ms. Mesot drove back to Clarksville. The F.B.I. kept the computer. Ms. Mesot was not present during Appellant's interview with the F.B.I. in Memphis and the agents did not interrogate or otherwise question Ms. Mesot.

After Appellant and Ms. Mesot arrived at their home on the evening of May 12, 2003, Appellant voluntarily told his wife about his sexual activities with their nineteen-month-old daughter. According to Ms. Mesot's testimony at trial, Appellant began performing oral sex on their daughter in November 2002. Appellant told his wife that the frequency of this sexual conduct was approximately once per week. According to Ms. Mesot, Appellant stated that the child would "run around naked through the house" and become "fussy" until Appellant performed oral sex on her. Appellant added that the child would pull his head down towards her genital area. Appellant denied having sexual intercourse with the victim. Appellant did admit to using the web cam to broadcast to other internet users his acts of engaging in oral sex with the victim. Appellant stated that he did this because "people would beg him to do it."

Detective Nichols was advised of the content of Appellant's interview with the F.B.I. agents on May 12, 2003, and he requested Appellant to return to the Clarksville Police Department for another interview. Detective Nichols wanted to discover specific dates of criminal activity. Appellant returned to the police department on May 15, 2003. Detective Nichols again advised Appellant of his <u>Miranda</u> rights and told Appellant again that he was there voluntarily and was free to leave at any time. Appellant signed a waiver of his <u>Miranda</u> rights. Detective Nichols and Appellant talked for about an hour in the interview room. Appellant said he would write out a statement and Detective Nichols left the room. Appellant's hand written statement was made an exhibit and reads as follows:

> The first time that my daughter and I had oral sex was about a week or so after Christmas. I was asleep on the couch and she came over and crawled up on top of me and sat down on my face and wiggled around a little. I stuck out my tongue and she seemed to like it. She would say "Yes, Yes" as she wiggled around and acted like she knew what was going on. After that I guess we engaged in this same activity once a week upon her request. If at any time she wanted me to stop then I would stop. Sometimes she wanted me to take my clothes off or rather helped/made me take them off after which she would see my penis and kind of get "scared" and help/make me put them back on.

> Sometimes she would touch my penis however, at this present time I do not recall her ever trying to put it in her mouth. As stated before she would normally get scared and say "No, No" and shake her head while I/we put my clothes back on.

The above is the substance of the evidence at trial. Appellant did not cross-examine Ms. Mesot, Detective Nichols, or Special Agent Lies. Appellant did not testify or offer any proof.

A summary of the evidence, taken in the light most favorable to the State, shows that Ms. Mesot discovered child pornography on the family computer in December 2002. These images had been downloaded by Appellant. Appellant admitted that for about eighteen months prior to May 2003, he had had a "curiosity of sexual interaction with children." He obtained internet access on his computer in December of 2002, the same month Ms. Mesot found the child pornography images. While the trial record is silent as to why Ms. Mesot waited four months to contact authorities, she nonetheless contacted the Clarksville Police Department on April 8, 2003, to make a "report." The very next day she requested that her parents come from Virginia and take her daughter home with them. Appellant was not alone with the victim from April 9, 2003, through the time of trial.

On April 21, 2003, Appellant voluntarily went to the Clarksville Police Department and agreed to speak with Detective Nichols. Appellant adamantly denied having any sexual contact with his daughter. At Detective Nichols' request, Appellant agreed to be interviewed by the F.B.I., and Special Agent Lies conducted the interview. Appellant agreed to bring his computer with him to the interview on May 12, 2003, but stated that he had "wiped" clean the child pornography images. Appellant signed a consent to allow law enforcement officers to search the computer. In the search the officers discovered five child pornography images in a "temporary internet file." The images were created on the computer on May 8, 2003. Appellant signed a waiver of his Miranda rights and then signed a typed statement in which he admitted, among other things, to reluctantly engaging in performing oral sex on his daughter while being broadcast over the internet via his web cam. He stated he did this at the urging of another internet user. He also admitted that on other unspecified occasions he performed oral sex on the victim and that she would touch his genitals.

Some hours later at his home in Clarksville, Appellant was alone with his wife and, according to her testimony, voluntarily told her what happened. Appellant proceeded to admit that he had performed oral sex on their daughter about once per week from November 2002 until the child was removed from the home in April 2003. He denied having sexual intercourse with the child, but did give his wife details about how the child would be naked and become fussy and cry and would stop only when he performed oral sex on her. He admitted to his wife that he had performed oral sex on the victim while being broadcast over the internet via the web cam. He stated to her that he did this because "people would beg him to do it."

Three days later on May 15, 2003, Appellant handwrote a statement for the Clarksville Police Department. He signed this statement. The statement was written by Appellant after voluntarily attending another interview with Detective Nichols in which Appellant was read and waived his Miranda rights. In the statement, Appellant admitted to numerous occasions of performing oral sex on his daughter and provided specific details about the incidents.

-4-

## II. Law and Analysis

In Opper v. United States, 348 U.S. 84, 75 S. Ct. 158 (1954), the defendant was convicted of a violation of 18 U.S.C. § 281, which prohibited a person from inducing a federal employee to accept outside compensation for services rendered regarding a federal contract. The defendant had admitted to the F.B.I. that he had met with the federal employee regarding the sale of goggles for emergency kit use by the Air Force and had loaned $1,200 in cash to the employee for payment on the employee's mortgage. The defendant admitted that no security was given for the loan, there was no agreement for interest, none of the money had been repaid as of the time of the interview with the F.B.I., and he did not know if the employee even owned a home. Independent of the defendant's statement to the F.B.I., the government was able to prove that a long distance phone call was made from the employee's home in Dayton, Ohio to the defendant's home in Chicago on April 13, 1951, that the defendant cashed a personal check dated April 13, 1951, for $1000, and that there was an airline ticket in the federal employee's name for a round trip flight from Dayton to Chicago on April 14, 1951, which returned the same day.

One of the defendant's issues raised on appeal by certiorari to the Supreme Court was "[w]hether a conviction can be sustained where there is, apart from an admission made to law enforcement officers after the acts charged as crimes, no proof of the corpus deliciti." Opper, 348 U.S. at 86 n.3, 75 S. Ct. at 161 n.3. Addressing this issue as a determination of "the extent of the corroboration of admissions necessary as a matter of law for a judgment of conviction," the Supreme Court reviewed the divergence of rulings by the federal courts. Id. at 92, 75 S. Ct. at 164. The Court in Opper concluded,

> Whether the differences in quantum and type of independent proof are in principle or of expression is difficult to determine. Each case has its own facts admitted and its own corroborative evidence, which leads to patent individualization of the opinions. *However, we think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti.* . . It is sufficient if the corroboration supports the essential facts admitted *sufficiently to justify a jury inference of their truth*.

Id. at 93, 75 S. Ct. at 164 (emphasis added).

Noting that the corroborative evidence in the Opper case which tended to prove the *truthfulness* of the defendant's statements *failed* to independently establish the corpus delicti of the charged offense, the Court still affirmed the convictions. The defendant's statement to the F.B.I. and the corroborative evidence of that statement established one element of the offense: the payment of money by defendant to the federal employee. Id. at 94, 75 S. Ct. at 165. The remaining element, namely the rendering of government related services by the federal employee, had been established entirely by other independent evidence not corroborative of the defendant's statement, but essential to establish all the elements of the offense necessary to sustain the conviction. (Introduction of "substantially uncontroverted evidence of [the federal employee's] efforts in gaining acceptance by

-5-

the Government of [the defendant's] previously rejected goggles." Id. at 94 n.13, 75 S. Ct. at 165 n.13.)

I conclude that the pertinent holding of Opper as it relates to the case *sub judice* is that evidence which is necessary to corroborate a defendant's confession does *not* have to independently establish the corpus delicti of the charged crime, and the most important factor to be determined is whether the corroboration sufficiently establishes the *trustworthiness* of the defendant's confession.

In Smith v. United States, 348 U.S. 147, 74 S. Ct. 194 (1954) decided the same day as Opper, the Supreme Court addressed the corroboration issue in a tax evasion case. Regarding the precise issue of the amount of corroboration required to substantiate the commission of the charged offense, the Supreme Court held:

> It is agreed that the corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that defendant is guilty . . . In addition to differing views on the substantiality of specific independent evidence, the debate has centered largely about two questions: (1) whether corroboration is necessary for all elements of the offense established by admissions alone . . . (2) whether it is sufficient if the corroboration merely fortifies the truth of the confession, without independently establishing the crime charged . . . We answer both in the affirmative. All elements of the offense must be established by independent evidence *or* corroborated admissions, but one available mode of corroboration *is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused*.

Smith, 348 U.S. at 156, 75 S. Ct. at 199. (emphasis added.)

The Court in Smith indicated that corroboration in that case must be "apart from petitioner's admissions," but it appears from a reading of Smith that all of the defendant's inculpatory statements were made to law enforcement officers. Id. at 157, 75 S. Ct. at 199, See generally Smith, Id. at 157 n.4, 75 S. Ct. at 200 n.4. Absent from Smith is an explicit prohibition from using one or more inculpatory statements by a defendant to corroborate a separate confession/admission in all aspects and in all circumstances.

Accordingly, based on Smith, I conclude that a confession/admission can be "bolstered" by independent evidence, which can allow the criminal offense to be proved "through" the defendant's statements.

At least one Tennessee case appears to permit statements made by a defendant to be part of the corroboration of that defendant's "confession." In Ricketts v. State, 192 Tenn. 649, 241 S.W.2d 604 (1951), the defendant was convicted of the arson of the dwelling house of Ms. Lena Gray in

Wayne County. Ms. Gray and her children left the home on July 4, 1950, at 9:00 a.m. and when they returned at 6:00 p.m. the home had burned down. Before they left they had extinguished the fire in the cook stove, and the stove was relatively new, the flue was in good condition, and the house was not wired for electricity. The day before the fire, Ms. Gray had purchased a two-gallon can of kerosene and placed it on the back porch near a milk bucket. Footprints were observed in a cultivated field "some distance away" from the burned home. These footprints led from the general area of Ms. Gray's home to the road going to the defendant's house, but the prints were not proven to belong to the defendant. On the day after the fire, the defendant left his home and went to Alabama to visit his uncle. He waived extradition and returned to Tennessee voluntarily after learning he was a suspect in the arson. On his way back the defendant "made certain statements and confessed to the burning of the dwelling house" of Ms. Gray. Ricketts, 241 S.W.2d at 605. According to our Supreme Court's opinion, the defendant "readily admitted that he set fire to the house," and a few days later signed a detailed written confession to the sheriff and two deputy fire marshals. Id. In a separate instance, the defendant "narrated substantially the same facts to other officers on a different occasion." Id. The officers testified at trial as to the defendant's narrative to them.

The issue on appeal in Ricketts was whether the State had corroborated the corpus delicti independently of the defendant's confession. Our Supreme Court noted that "[n]o universal and invariable rule can be laid down as to what would amount to proof of corpus delicti. Each case depends on its own peculiar circumstance." Id.

Noting that inculpatory statements made by the defendant *in addition to* the signed confession could be included as corroborating evidence, the Court in Ricketts held:

> It seems to us that from these various things, *above indicated aside from the confession*, that there is sufficient corroborating evidence to connect the [defendant] in error with this fire. The evidence plainly negatives any accidental or providential cause of the fire and leaves only one inference that the jury could draw that the fire was set by someone. It seems that the jury had the right to infer from these things, from the fleeing from this State to the State of Alabama by the [defendant], the fact that the tracks crossed the field in that way, *and that he had made statements of what he did, were sufficient to corroborate the written confession.*

Id. at 606 (emphasis added).

More recently in State v. Smith, 24 S.W.3d 274 (Tenn. 2000), our Supreme Court relied upon Ricketts, Ashby v. State, 124 Tenn. 684, 139 S.W. 872 (1911), and Van Zandt v. State, 218 Tenn. 187, 402 S.W.2d 130 (1966) to reaffirm the requirement that the State cannot base a conviction *solely* on a defendant's confession. There must be some corroborating evidence that establishes the corpus delicti or body of the crime. Smith, 24 S.W.3d at 281. "[T]he State needs 'only *slight evidence* of the corpus delicti . . . to corroborate a confession and sustain a conviction.'" Id. (quoting State v. Driver, 634 S.W.2d 601, 606 (Tenn. Crim. App. 1981) (emphasis added)).

In State v. Ellis, 89 S.W.3d 584 (Tenn. Crim. App. 2000), the defendant was convicted of one count of rape of a child, two counts of aggravated sexual battery, and two counts of assault. The convictions arose from the defendant's relationship with the victim, a nine-year-old child whom defendant was regularly babysitting. In a statement to the police, the defendant, among other things, admitted to digital penetration of the victim, performing oral sex on the victim, and having the victim perform oral sex on him. He stated that he did not have sexual intercourse with the victim. Subsequently, on the way to the hospital to have blood drawn for a blood test, the defendant volunteered additional statements to another law enforcement officer who was transporting the defendant. The defendant again denied penile penetration of the victim but again acknowledged specifically that the victim had performed oral sex on him.

Later, in one of two letters the defendant wrote his wife, he stated, "[o]ne night when I was on the couch with a blanket over me, . . . [the victim] got under the blanket and gave me a blow job." Id. at 591. There was circumstantial evidence of old, healed tears in the victim's hymen after the investigation of the defendant began, but the testimony revealed that these tears could have been caused several years before in events unrelated to the defendant.

The defendant's conviction for rape of a child was based upon proof that the victim performed oral sex on him. Id. at 599-600. On appeal the defendant asserted that the evidence was insufficient to support his conviction for rape of a child because the only proof of the crime was the defendant's uncorroborated incriminating statements to the police and to his wife. There was without question sufficient corroboration to support the convictions for two counts of aggravated sexual battery. However, the defendant specifically argued that proof of "his ongoing sexual relationship" with the victim was not corroboration of his inculpatory statements. Id. at 600. This Court disagreed.

Relying upon State v. Rickman, 876 S.W.2d 824 (Tenn. 1994), this Court in Ellis concluded that evidence of ongoing sexual activity of the defendant and the victim was sufficient to corroborate the defendant's confessions that he had engaged in a specific act of oral sex with the victim. Ellis, 89 S.W.3d at 600. From the opinion, I glean that there was no testimony from the victim or any other eyewitness regarding the fellatio, and there was no physical or scientific evidence to independently establish that fellatio occurred.

Based upon a thorough review of Tennessee case law, I have been unable to find any opinion that unequivocally holds that one or more statement(s) by a defendant can *never* be used to corroborate a defendant's confession. In fact, Ricketts holds that *an independent* statement by a defendant which is independent of his confession *can* be used as part of the necessary corroboration. Independent evidence can be used to "bolster" a defendant's confession such that the case can be proven "through" the defendant's confession. Smith, 348 U.S. at 156, 75 S. Ct. at 199. Opper teaches that the most important factor to be determined is whether the corroboration supports the *truthfulness* of the confession. Furthermore, the corroboration need not independently establish the corpus delicti. Opper, 384 U.S. at 93, 75 S. Ct. at 164.

Appellant's statement on May 12, 2003, to the F.B.I. that he had "found [himself] struggling with a curiosity of sexual interaction with children" for approximately one and one half years was directly corroborated by Appellant's wife's testimony that she found child pornography on Appellant's computer in December 2002 and by the five images found on the computer by the F.B.I., and downloaded by Appellant in May 2003. Appellant's statement to Detective Nichols on May 15, 2003, though separate from the one he gave to the F.B.I., was essentially a continuation of the "F.B.I. statement" because it was done by Detective Nichols to obtain specific dates of criminal activity. Accordingly, I conclude that the above mentioned corroboration of the truthfulness of the May 12, 2003 "F.B.I. statement" extends to the May 15, 2003 statement to Detective Nichols. Moreover, Appellant handwrote the entire statement while alone and this, at least to an extent, weighs towards the truthfulness of the statement.

Finally, I view Appellant's detailed admission to his wife on May 12, 2003, after they had returned home from Memphis, to be sufficient corroboration of the corpus delicti in this case. I state this with a cautionary note, however. I do not conclude that in all cases where there are multiple inculpatory statements by a defendant that corroboration of one confession will always be found by the additional statement(s). However, the particular facts of the instant case, the sequence of events, and the timing and nature of the three statements allows me to conclude that Appellant's convictions should not be reversed due to lack of corroboration of his confessions. As noted by our Supreme Court in Ricketts, "[n]o universal and invariable rule can be laid down as to what would amount to proof of corpus delicti. Each case depends on its own peculiar circumstances." Ricketts, 241 S.W.2d at 605. In the "peculiar circumstances" of the instant case, I would affirm the convictions of rape of a child. In all other aspects I concur with the majority opinion.

_____
THOMAS T. WOODALL, JUDGE