IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 4, 2016 Session

## STATE OF TENNESSEE v. JANET MICHELLE STANFIELD, TONY ALAN WINSETT and JUSTIN BRADLEY STANFIELD

**Appeal from the Circuit Court for Obion County**
**No. CC-15-CR-84   Jeff Parham, Judge**
_____

**No. W2015-02503-CCA-R3-CD  -  Filed March 31, 2017**
_____

The Defendants, Janet Michelle Stanfield, Tony Alan Winsett, and Justin Bradley Stanfield, were indicted by the Obion County Grand Jury for various drug and firearm offenses following a warrantless search of their house.  The Defendants filed motions to suppress the evidence seized, and the trial court granted the motions and dismissed the case.  The State appeals, asserting that the warrantless search was valid and the evidence was admissible.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Tommy A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the Appellant, State of Tennessee.

Beau E. Pemberton, Dresden, Tennessee, for the Appellee, Janet Michelle Stanfield.

Charles S. Kelly, Sr., Dyersbug, Tennessee, for the Appellee, Tony Alan Winsett.

Bruce B. Brown, Union City, Tennessee, for the Appellee, Justin Bradley Stanfield.

## OPINION

This case arises from the warrantless search of the Defendants' house by officers conducting a parolee search.  On June 2, 2015, Janet Michelle Stanfield, a probationer, and Tony Alan Winsett, a parolee, were indicted for possession of more than 0.5 grams of methamphetamine with intent to deliver or sell, possession of a firearm by a convicted

felon, and possession of drug paraphernalia. Additionally, Stanfield was indicted for unlawful possession of Alprazolam, and Winsett was indicted for evading arrest. Justin Bradley Stanfield,[1] Janet Stanfield's son, was indicted for possession of marijuana with intent to deliver or sell. Prior to trial, the Defendants moved to suppress evidence obtained from the search of their house, and Janet Stanfield moved to suppress the evidence discovered from a search of her person. An evidentiary hearing was held on November 2, 2015.

**Suppression Hearing.** Officer Ben Yates of the Union City Police Department's Drug Task Force testified that on April 6, 2015, he planned to conduct a parole search of Winsett's house at 3089 Shady Grove Road in Union City. Officer Yates had received information that Winsett "was using methamphetamine and possibly injecting with needles" and he knew that Winsett was currently on parole. Officer Yates was accompanied by his partner, Investigator David Crocker, and Agent James Hall. Upon arriving at Winsett's house, Agent Hall observed a burn pile near the house. Agent Hall informed Officer Yates that he found "some clear plastic bags in the burn pile," and because the bags were dry and it had been raining that day, the officers "knew the bags seemed to be pretty fresh." Officer Yates testified that the officers found marijuana residue in the bags. Officer Yates was aware that both Janet and Justin Stanfield lived in the house with Winsett.

Officer Yates testified that he knocked on the front door, and Investigator Crocker knocked on the back door of the house, but there was no answer. Officer Yates knew from being at the house on "previous occasions" that there were security cameras facing towards the road, the yard, and the driveway. Officer Yates observed that there were no cars in the driveway. He also noticed that a window was open and a light was on inside the house. Officer Yates testified that, while the other two officers continued knocking on the front and back doors, he heard movement inside the house through the open window. Officer Yates testified that the other two officers also confirmed hearing the noise and that it "[s]ounded like a running noise" but that he "[c]ouldn't tell who it was, what it was[,] or anything like that." Because of the security cameras and the plastic bags with marijuana residue found on the burn pile, Officer Yates and the officers "believed somebody was in the house destroying evidence."

Agent Hall then used a pocket knife to open the front door of the house. Officer Yates testified that, once inside, he noticed a "very strong odor of marijuana" and a large pit bull dog in the living room, which was the first room the officers entered. The

---

[1] Because Janet and Justin Stanfield share the same last name, we will occasionally refer to each of them by their first names for clarity purposes. We mean no disrespect in using their first names in this opinion.

officers determined that the dog "was the only living thing inside the home when [they] made entry," and they concluded that the dog was making the noises they heard from outside the house. However, the officers identified three bedrooms in the house and proceeded to search each bedroom. Officer Yates testified that the officers identified the first bedroom as that of Janet and Winsett and that the officers knew they "were in a relationship[] [and] had been for some time." Officer Yates identified Janet and Winsett's bedroom based on a jacket in the room that Officer Yates testified "Mr. Winsett had wore [sic] . . . on a previous occasion when [the officers] encountered him." The second bedroom was identified as Justin's room based on a work identification card containing his name and picture as well as a piece of mail with his name, both of which were found inside a nightstand drawer in his bedroom. Officer Yates testified that all three bedroom doors were open, that the third bedroom was being used as storage, and that this room had the open window he observed from outside the house.

In Janet and Winsett's bedroom, officers found a black 9mm Smith & Wesson handgun with a scratched off serial number as well as thirty-five rounds of ammunition in the top drawer of a dresser. Officer Yates testified that the dresser was located behind the door of the bedroom and that the gun was "under clothes, socks and underwear." Under a computer table next to the bed, officers found a gray plastic container with several sets of clear plastic bags, digital scales, a marijuana pipe, and a small flashlight inside. After discovering that the flashlight did not work, Officer Yates unscrewed the back of the flashlight and found a small clear bag containing a crystal substance that he identified as methamphetamine. Inside the pocket of a jacket hanging on the bed post the officers also found a pill container with a plastic package inside containing what was later determined to be 13.14 grams of methamphetamine.

Meanwhile, Agent Hall searched Justin's bedroom where he found a large glass container containing "approximately seven ounces of marijuana." The officers also found another handgun inside a nightstand in Justin's bedroom. Officer Yates testified that no evidence was seized from anywhere else inside the house besides the two bedrooms.

In Janet and Winsett's bedroom, a television monitor provided live feed from the security cameras placed outside of the house. While still inside, the officers watched on the monitor as a red Mitsubishi Eclipse slowed down near the driveway of the home and then accelerated away "at a high rate of speed." Officer Yates testified that he knew that Justin drove a red Mitsubishi Eclipse, so the officers "exited the home in our patrol unit and did conduct a traffic stop of Mr. Stanfield." Officer Yates subsequently arrested Justin, but found no contraband on his person or in his car. Officer Yates asked Justin repeatedly whether he sold marijuana, which Justin denied. Officer Yates then informed Justin about the marijuana found in his bedroom, and Justin "stated that he did sell

marijuana." Officer Yates next asked Justin "for verbal consent to search [his] cell phone," which Justin granted. Officer Yates asked Justin to unlock the cell phone and when he did the screen indicated "something along the lines of deleting all messages." Officer Yates concluded that, during the traffic stop, Justin had attempted to erase his phone. However, as Officer Yates was holding Justin's cell phone, a new text message appeared from a contact named "Freezer Guy" requesting a meeting with Justin. Justin informed Officer Yates that he did not know "Freezer Guy's" real name, but that he drove a green Toyota car and was supposed to be meeting Justin to purchase one ounce of marijuana.

After Justin was transported to the Obion County Jail, Officer Yates proceeded to meet "Freezer Guy" and subsequently identified and arrested him at the meeting location. While Officer Yates was arresting "Freezer Guy," he observed a blue Buick car drive by which matched the description of the car he knew Winsett and Janet to drive. Although Officer Yates could not identify the driver or any passenger of the car, he called Agent Hall and advised him "that [he] had just observed a vehicle matching the description." Agent Hall then called and notified officers that he was in pursuit of the vehicle and that it was refusing to stop. Officer Yates left to assist Agent Hall, and, when he arrived on the scene, Agent Hall was detaining the front seat passenger, Janet. Agent Hall informed Officer Yates that he had already placed the driver, Winsett, in custody in his patrol car. The officers completed a search of the car and Agent Hall found a small plastic bag containing four pills in Janet's purse. Officer Yates testified that nothing else was found in the car or on either person besides the pills, which were later identified as Alprazolam.

On cross-examination, Officer Yates confirmed that he, Agent Hall, and Investigator Crocker were all assigned to the drug task force and that none of the officers were probation or parole officers. Officer Yates stated that he did not attempt to obtain a search warrant in this case because "we didn't need a search warrant." Officer Yates testified that the parole search was initiated based on a tip from a confidential informant. The informant had a criminal history and had allegedly provided reliable information in the past; however, Officer Yates could not recall how the informant knew the information he provided or what his basis of knowledge was. Additionally, Officer Yates testified that the informant's previous tip had only led to one potential conviction that was still pending. Officer Yates testified that the search took place, "[t]o the best of [his] knowledge, between 1 and 3 p.m." Officer Yates confirmed that, after entering the house, no contraband was found until the officers began opening drawers and searching. Officer Yates testified that he did not know if the house was rented or owned by any of the three Defendants, but that "for as long as [he had] been employed with the Union City Police Department, [he] had knowledge that Ms. Stanfield lived there" and that, every time he had seen Janet around she was accompanied by Winsett. Officer Yates was also

familiar with the cars that all three Defendants drove. Additionally, Officer Yates explained that:

> [O]n two previous occasions [he had] been at the residence to conduct a parole search, no vehicles there, didn't observe anything laying [sic] outside, no answer, [he] left the residence. The reason for the entry into the home this particular time was due to evidence found laying [sic] in front of my patrol unit when we pulled up, the security cameras on the house, us knocking on the doors, we could hear movement running inside.

Officer Yates testified that the officers knocked and waited "approximately 10 to 20 minutes" before entering the home. Officer Yates also estimated that the officers spent "30 to 40 minutes" searching the house. Officer Yates testified that he stopped all three Defendants to place them under arrest based on the evidence found in the house. Officer Yates confirmed that he could not smell marijuana while he was outside of the house. Additionally, Officer Yates testified that, to the best of his knowledge, neither Janet nor Justin were on probation or parole.

After cross-examination, the trial court asked Officer Yates additional questions. In response to the court's inquiry as to why Officer Yates did not contact a parole officer to go with him on the parole check, Officer Yates stated that he called the parole officer for a copy of Winsett's parole certificate but did not ask a parole officer to accompany the officers. Officer Yates also clarified that the dog found inside the house never barked while the officers were knocking on the doors and waiting outside the house.

Dana Powell, Winsett's parole officer, testified that Winsett had been on parole since May 2, 2013. Officer Powell testified that Winsett had signed rules of supervision, which were introduced as an exhibit. Specifically, Rule 8 of Winsett's parole certificate reads that "I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time without reasonable suspicion." On cross-examination, Officer Powell acknowledged that a parolee would not be released from jail without signing the rules of supervision. Officer Powell confirmed that the rules of supervision were faxed to Officer Yates at 3:39 p.m. on April 6, 2015. Officer Powell also confirmed that 3089 North Shady Grove Road was listed as Winsett's place of residence in her files.

Stephanie Buchanan, Janet's probation officer, testified that Janet had been on probation since August 9, 2013. Officer Buchanan testified that Janet had signed the Westate Corrections Network's Community Correction rules, which were introduced as an exhibit and included the following rule:

Offenders will allow the Case Officer to visit his/her home, employment site, or elsewhere at any time during the day or night and shall carry out all instructions given by the Case Officer, whether oral or in writing. Offenders will allow law enforcement to conduct a search of offender and all areas of the house upon request to control contraband or locate missing or stolen property.

Officer Buchanan confirmed that she was never contacted by Officer Yates and that he "had no knowledge" of Janet's probation status.

On re-examination, Officer Yates clarified that there would be no documentation confirming what time the search of the house was performed. However, Officer Yates testified that "to the best of [his] knowledge, [he] received the fax before [the officers] left to do the search."

On November 13, 2015, the trial court entered an order granting the motion to suppress the evidence obtained from the house and from Janet Stanfield's person. The trial court found that,

> [O]nce [the officers] entered the residence and had secured it, the Court finds that at that point they should have gotten a warrant, that with no one present, there was no harm, there was [sic] no exigent circumstances to justify the continued Fourth Amendment intrusion, therefore, I'm going to suppress the evidence.

The trial court also found that, once the house was secured, "if the parolee [wa]s not present, if there's probable cause to believe that there's contraband in the house, particularly in drawers, then I'm saying that at that point they need a warrant." Accordingly, the trial court granted the Defendants' motions to suppress and dismissed the indictment. It is from this order that the State now timely appeals.

## ANALYSIS

On appeal, the State argues that the trial court erred in granting the Defendants' motion to suppress because "Ms. Stanfield was a probationer, Mr. Winsett was a parolee, and both had granted sweeping consent to search their residences." Additionally, the State contends that because the bedroom doors were open, it "appear[ed] as though the house was a common area." The Defendants respond that the trial court did not err in granting the motions to suppress because the forced entry into their home was constitutionally unreasonable, notwithstanding any parolee or probationer status.

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. Id. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. Id. We review the trial court's conclusions of law de novo. State v. Carter, 160 S.W.3d 526, 531 (Tenn. 2005).

The Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. "[U]nder both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)). In the case of a warrantless search, the State bears the burden of proving that the search was conducted pursuant to one of the exceptions to the warrant requirement. Id.

"The basic rule against warrantless searches is also relaxed if the person being searched has been convicted of a criminal offense and is serving a sentence." State v. Turner, 297 S.W.3d 155, 161 (Tenn. 2009). An offender's status as a probationer or a parolee "alters what is 'reasonable' for purposes of the Fourth Amendment." Id.

**I. Warrantless Parolee Search: Tony Winsett's Motion to Suppress.** First, the State argues that the trial court improperly granted Winsett's motion to suppress because he consented to the search by nature of his parolee status. Winsett responds that, despite his parolee status, the search was constitutionally unreasonable considering the totality of the circumstances.

The Tennessee Supreme Court addressed warrantless parolee searches in State v. Turner. 297 S.W.3d 155. In Turner, the Tennessee Supreme Court held that "parolees who are subject to a warrantless search condition may be searched without reasonable or individualized suspicion." Id. at 157. However, the Court explained that "the totality of the circumstances surrounding a warrantless, suspicionless search of a parolee must be examined to determine whether the search is constitutionally unreasonable." Id. at 167. Turner followed the United States Supreme Court's decision in Samson v. California, where a parolee had agreed, as a condition of release and pursuant to a California statute, to be subject to a search at any time and without cause. 547 U.S. 843, 846 (2006). The United States Supreme Court declined to address whether this written waiver operated as consent within the meaning of the Fourth Amendment, concluding instead that the search

was reasonable under the totality of the circumstances. Id. at 852 n.3. Turner likewise did not analyze the parolee search based on consent.

Turner, like the present case, originated in Obion County and concerned the actions of the Union City Police Department's 27th Judicial District Drug Task Force. In Turner, an officer performed an admittedly "pretextual" stop of a known parolee for a seatbelt violation. 297 S.W.3d at 158. After performing a search of the parolee and her car, the officers escorted the parolee to her house where she let officers in to search further. Id. at 158. Although no drugs were found on the parolee or in her car, the officer decided to search her house "based on '[t]he conditions of her parole and the rules of the United States Supreme Court.'" Id. at 159. The Tennessee Supreme Court found that the search was not unreasonable when examined under the totality of the circumstances which included: "no proof in the record that [the officer] acted for any reason other than the furtherance of legitimate law enforcement concerns," the defendant's prior drug convictions, "information from an informant that [the parolee] was selling crack cocaine," and verification of the defendant's parolee status and warrantless search condition before the search of her house. Id. at 168.

Here, both the State and Winsett rely on Turner in support of their respective positions. The State argues that the totality of the circumstances weigh against Winsett because "he signed a sweeping consent, there was reasonable suspicion, and he was cohabitating with someone who also had a diminished expectation of privacy by virtue of, among other things, a broad consent to search." However, the State provides no reasonable suspicion analysis, does not address the confidential informant's tip, and appears to merely rely on Winsett's parolee agreement as the entirety of the circumstances justifying the warrantless search. The State also provides no legal authority or argument supporting its contention that cohabitation with a probationer supports the warrantless parolee search in this case. In any event, we will address the totality of the circumstances analysis surrounding the warrantless parolee search in this case.

First, the tip which initiated the parolee search here came from an unidentified informant whose reliability and basis of knowledge was not established. See State v. Simpson, 968 S.W.2d 776, 781 (Tenn. 1998) (assessing informant's reliability by considering credibility and basis of knowledge when a tip provides officers with reasonable suspicion). Additionally, although the evidence in the burn pile, security cameras, and unidentified noise coming from inside the house may have created exigent circumstances for officers to cause forced entry into the house, as the trial court ruled, any potential exigent circumstances that prompted the officers to break-in to the home no longer existed once the officers realized no one was home destroying evidence and that a dog was making the "suspicious" noise. Once the house was "cleared," the subsequent

extensive search without the parolee's presence did not further any legitimate law enforcement concerns as contemplated by Turner. Accordingly, the instant search is distinguishable from Turner. Considering the totality of the circumstances, we conclude that the trial court correctly suppressed the evidence against Winsett as the search was constitutionally unreasonable. The State's argument is without merit.

## II. Warrantless Probationer Search: Janet Stanfield's Motion to Suppress.

Next, the State argues that the trial court improperly granted Janet's motion to suppress because of her probationer status, her cohabitation with a parolee, and because reasonable suspicion supported the search. Janet responds that her probation agreement was not a "sweeping consent" to search and that no reasonable suspicion existed to justify the search.

The trial court made no separate findings as to each Defendant and did not address the existence of reasonable suspicion. However, this court has held that, "[w]hen a person has signed a probation agreement providing written consent for a warrantless search of the person's residence, such a search may be conducted if reasonable suspicion for the search exists." State v. Tracy Lynn Carman-Thacker, No. M2014-01859-CCA-R3-CD, 2015 WL 5240209, at *5 (Tenn. Crim. App. Sept. 8, 2015) (citing United States v. Knights, 534 U.S. 112 (2001), and State v. Davis, 191 S.W.3d 118 (Tenn. Crim. App. 2006)) (no perm. app. filed). "When determining whether an officer had reasonable suspicion, a court must consider the totality of the circumstances, as well as the rational inferences and deductions that a trained officer may draw from the facts known by the officer." State v. Robert Lee Hammonds, No. M2005-01352-CCA-R3-CD, 2006 WL 3431923, at *11 (Tenn. Crim. App. Nov. 29, 2006) (citing State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992)).

In its brief, the State cites Knights and the requirement of reasonable suspicion for a probationer search, but then proceeds to engage in a general totality of the circumstances pursuant to the Sixth Circuit case of United States v. Tessier. 814 F.3d 432 (6th Cir. 2016). The State even goes so far as to summarily conclude that, "[w]hile under Tessier, reasonable suspicion was not necessary, its presence adds to the reasonableness of the search." The State ultimately engages in a totality of the circumstances analysis.

Notwithstanding the State's failure to adequately address the issue, we conclude that there was no reasonable suspicion to support the search in this case and that Janet's probation agreement does not provide the "sweeping consent" that the State contends it does. Rather, the instant probation agreement requires that "[o]ffenders will allow law

- 9 -

enforcement to conduct a search of offender and all areas of the house upon request to control contraband or locate missing or stolen property." This language is much narrower than the probation agreements in <u>Knights</u>, <u>Tessier</u>, and <u>Tracy Lynn Carman-Thacker</u>, which do not require a request to search and do not limit the search to contraband or stolen property. <u>See</u> <u>Knights</u>, 534 U.S. at 114; <u>Tessier</u>, 814 F.3d at 433; <u>Tracy Lynn Carman-Thacker</u>, 2015 WL 5240209, at *2. Furthermore, the record reflects that Officer Yates never knew about Janet's probation status at any point before or during the search of the house.

Additionally, the record does not show that, at the time the officers searched the house, they had adequate reasonable suspicion, or any suspicion, that Janet was engaged or was engaging in criminal activity. Rather, the facts show that the sole basis of the purported consent to search was actually based on Winsett's parolee status, not Janet's probationer status, and we have previously concluded that, considering the totality of the circumstances, the officers' search of the house did not comport with Constitutional limits. Furthermore, the subsequent traffic stop and search of Janet's person was too attenuated from the search of her house, and because the stop and seizure was based completely on the evidence found during the search of the house, the evidence seized from her person was also properly suppressed.[2] Because the search relating to Janet was not supported by reasonable suspicion and, due to the narrow language of her probation agreement, we conclude that the trial court correctly suppressed the evidence.

**III. <u>Common Authority: Justin Stanfield's Motion to Suppress.</u>** Finally, the State argues that because Justin was "living under the same roof" as a parolee and a probationer, he had a diminished privacy interest and that the trial court improperly suppressed the evidence found in his bedroom. The State also argues that because Justin's bedroom door was open, this suggested "shared common authority over the bedrooms."

Consent for a warrantless search may be given by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought

---

[2] The State attempts to argue in a conclusory footnote in its brief that Janet's search could be validated "as a search incident to arrest." However, the State provides no further discussion or legal authority and is raising this issue for the first time on appeal. Therefore, the issue is waived. <u>See</u> Tenn. R. Crim. P. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."); <u>see also</u> <u>Cauthern v. State</u>, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived.").

- 10 -

to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974).  The United States Supreme Court defined the "common authority" needed to legitimize a third-party's consent to a warrantless search:

> The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 171 n.7 (internal citations omitted).

Subsequently, Tennessee courts adopting Matlock have held that the State may satisfy its burden of proving valid consent by: (1) "demonstrating that the third party in fact possessed common authority[,]" or (2) "demonstrating that the facts available to the searching police officers would have warranted a man of reasonable caution in the belief that the consenting party had authority over the premises."  State v. Ellis, 89 S.W.3d 584, 593 (Tenn. Crim. App. 2000).

The only fact presented and relied upon by the State to establish common authority is that Justin's bedroom door was open.  This alone is insufficient to establish that Winsett or Janet in fact possessed common authority or that searching police officers would have reasonably believed that Winsett had authority over Justin's bedroom.  To the contrary, the officers acknowledged the separate identity of each bedroom and its respective occupants, and no evidence was presented as to who owned or leased the house.  Accordingly, the State has failed to show that either of Justin's co-defendants had common authority over his private bedroom.  The State is not entitled to relief on this issue.

## CONCLUSION

Based on a thorough review of the record, we affirm the trial court's ruling suppressing the evidence and dismissing the indictment as to all three Defendants.

_____
CAMILLE R. McMULLEN, JUDGE

- 11 -