IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 3, 2025 Session

## STATE OF TENNESSEE v. LORENZO ROMELL BROWN

**Appeal from the Circuit Court for Warren County**
**No. 19-CR-2391     Larry B. Stanley, Jr., Judge**

————————————————————

**No. M2024-01042-CCA-R3-CD**

————————————————————

Defendant, Lorenzo Romell Brown, was convicted by a Warren County jury of attempted voluntary manslaughter, two counts of aggravated assault, and possession of a firearm by a convicted felon. The trial court imposed an effective twenty-year sentence. Defendant appeals, arguing that the State failed to prove that venue was proper in Warren County, his convictions for aggravated assault must be merged, and the trial court erred in imposing partial consecutive sentences. Following our review of the entire record, briefs and oral arguments of the parties, and the applicable law, we affirm the trial court's judgments of conviction but remand for a new sentencing hearing and for merger of Defendant's aggravated assault convictions.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed in Part; Reversed and Remanded in Part**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

Drew Justice, Murfreesboro, Tennessee (on appeal), and Daniel Barnes, Sparta, Tennessee (at trial and sentencing), for the appellant, Lorenzo Romell Brown.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Felicia Walkup and Randall Gilliam, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

*Trial*

On September 6, 2019, Defendant was indicted for attempted first degree murder (count one), aggravated assault causing serious bodily injury (count two), aggravated assault involving the use of a deadly weapon (count three), employing a firearm during the attempt to commit a dangerous felony, namely attempted first degree murder (count four), and possession of a firearm after having been convicted of a felony involving the use of force, violence, or a deadly weapon (count five) for the May 27, 2019 shooting of Jesse Palmer.

Jesse Palmer, the victim, was a lifelong Warren County resident. In 2019, the victim was dating Amanda Dunahee, who lived on Lyndon Street in the West Riverside Apartment Complex ("West Riverside").[1] The victim acknowledged that he had been banned from West Riverside "[f]or being arrested for stolen property and having cocaine on [his] person." The victim knew Defendant; the men were "not friends but acquaintances." Problems developed between the victim and Defendant because Defendant "started staying high all the time and acting sketchy." The victim thought Defendant had "issues" with him because Defendant "was always doped up" and thought the victim was "trying to snitch on him." Sometime prior to May 27, 2019, the victim recalled that, "[Defendant] took the phone from [Ms. Dunahee] when I was in jail and told me that he was going to kill me when I got out."

On May 27, 2019, which was Memorial Day, the victim went to West Riverside "around lunchtime" before Ms. Dunahee left for work. The victim then left West Riverside and went to a party. He acknowledged that he drank alcohol at the party and was "under the influence" but denied that he was "drunk" because he "could function normally." Around 9 p.m., the victim dropped off a friend at West Riverside and went to a store. He returned around 10 p.m. and parked his car "on Hardaway" then "walked up off of Hardaway through the apartments onto West Muncey headed towards Lyndon Street" to visit his aunt, Helen Giles, who also lived at West Riverside. However, because he "was talking to people," he did not make it to Ms. Giles's apartment.

While the victim was talking with people, he "got hollered at" by Defendant, who said, "Hey, Jesse, you motherf*****g snitch." The victim "kind of got a little heated," and responded, "What the f**k do you want?" Defendant and the victim continued to yell while moving toward each other and Defendant was "[j]umping around, swinging his arms, [and] kicking his legs." Before the men reached each other, Defendant's girlfriend, Cherish

---

[1] The victim and Ms. Dunahee were married at the time of trial, and she had changed her last name. For clarity, we will use her last name at the time of the offense.

McKinney "stepped in the way."  Ms. McKinney told the victim "to get the F off the property and started swinging at [him] with a stick."  Ms. McKinney struck the victim with her fists and a stick but eventually fell to the ground after the victim "dodged" a punch. Defendant helped Ms. McKinney up off the ground and into the apartment.  The victim said that then Defendant and Ms. McKinney "went back towards the house. [Defendant] opened the screen door. [Ms. McKinney] walked in. [Defendant] turned back around and then shot me."  The victim confirmed that the confrontation occurred in the front yard of 114 West Muncey Street.

After being shot, the victim "turned around and went the other way"; he did not see where Defendant went.  He was in pain, bleeding, and "[s]pitting up blood" while he walked.  The victim sat on the steps outside of "102 and 104 Lyndon Street" and called 911.  The victim was unable to complete the 911 call, but Ms. Giles walked out of her apartment and finished the call.  The victim "vaguely" remembered speaking with officers at the scene.  He remembered telling officers that Defendant had shot him at the store in front of West Riverside instead of where it actually happened because he was not supposed to be on the property.

The victim did not remember the ambulance ride but confirmed that he "had been transported from Warren County to Erlanger Hospital[.]"  The victim's injuries included internal bleeding, a ruptured spleen, and a collapsed lung.  He described his injuries and the surgery as follows: "My spleen had ruptured. My lung collapsed, internally bleeding. I don't know how to explain all of it, but they took one of my kidneys. They took my spleen, half of my stomach, half of my lung and my diaphragm."  The victim was hospitalized for seven days.

On cross-examination, the victim admitted that he had a knife in his pocket before the shooting but stated that he threw the knife and his hat to the ground before the incident. The victim remembered giving a statement to McMinnville Police Department ("MPD") Detective Sergeant Stuart Whitman shortly after he was released from the hospital but claimed that he was high on prescribed pain medication at the time of the interview.  He agreed that during the interview with Detective Sergeant Whitman, he had incorrectly implied that he was passing through West Riverside rather than visiting Ms. Giles.

MPD Officer Mike Starkey[2] was assigned to patrol the McMinnville Housing Authority properties.  That night, he responded to a "gunshot" call at West Riverside, which he confirmed was part of the McMinnville Housing Authority.  Officer Starkey confirmed that he had a body-worn camera on his person that automatically activated when he turned

---

[2] Officer Starkey was retired at the time of trial.

on the lights and sirens in his patrol vehicle; footage from the body-worn camera was admitted into evidence.

When he arrived at West Riverside, Officer Starkey located the victim "lying on the steps going down to 104 Lyndon Street[.]" Officer Starkey recognized the victim because he had previously banned the victim from West Riverside. The victim was in "[p]retty bad condition[,]" but was conscious and responded to Officer Starkey's questions. When asked who shot him, the victim responded that Defendant had shot him "by the store" in front of West Riverside. Officer Starkey was familiar with Defendant because he had also previously banned Defendant from West Riverside. However, Officer Starkey knew that Defendant had been living at 114 West Muncey Street with Ms. McKinney. A woman who lived at 102 Lyndon Street approached Officer Starkey and gave him the victim's cell phone. The woman told Officer Starkey that she had gone outside to smoke and saw the victim "leaning on the steps on the phone." Another woman told Officer Starkey that the victim showed up at her home "drunk" between thirty and forty minutes earlier.

Officer Starkey remained on the scene at 104 Lyndon Street while other officers went to 114 Muncey Street to look for Defendant. Officer Starkey interviewed some people who were outside but did not find any eyewitnesses to the shooting; some people said they heard a gunshot. Officer Starkey confirmed that the investigation revealed that the shooting did not occur at the store as the victim had told him.

On cross-examination, Officer Starkey agreed that the evidence showed that the shooting occurred at 114 West Muncey Street. He affirmed that he did not take a statement from the woman on the scene who said that the victim had shown up to her house drunk or the woman who said that the victim had come to her home to ask where Defendant was.

When MPD Lieutenant Paul Springer responded to West Riverside, the victim was "pale, unresponsive, [and] unconscious." Lieutenant Springer confirmed that the victim was alive and then investigated where the shooting occurred. He noticed and followed "a trail of blood" from where the victim lay, behind 104 Lyndon Street, "across a grassy area that separates the rear of two different streets and then ultimately located the scene . . . at 114 West Muncey" Street. Lieutenant Springer noticed signs of "a struggle" or "altercation," including a "toppled over" shrub, flip flops that "were haphazardly strewn about," and a "grill toppled over[.]" The front door at 114 West Muncey Street was closed so officers knocked on the front and back doors "repeatedly" but did not receive a response. Lieutenant Springer confirmed that officers were "actively looking for" Defendant but did not locate him on May 27. Lieutenant Springer did not locate any eyewitnesses to the shooting, but he did speak with a woman who "came out because [she] heard the gunshot and witnessed [the victim] limping away[.]" At approximately 3:00 a.m. on May 28,

Lieutenant Springer returned a phone call from a woman who gave him some information about the shooting; the woman refused to identify herself.

Jessica Furman testified that she was not present at the time of the shooting, but she knew both Defendant and the victim. She confirmed that she had called and provided information to an officer on the night of the shooting and had at that time refused to identify herself. Ms. Furman told the officer, "One of my friends, [Defendant], shot a buddy of mine, [the victim] . . . over some drugs or something." She also told the officer that prior to the shooting, Defendant had "said that he was going to have to shoot [the victim]" because the victim was "snitching;" Ms. Furman thought he was joking. On cross-examination, Ms. Furman confirmed that she understood Defendant's statement that he "would have to" shoot the victim to imply that he did not have a choice.

At approximately 10:15 p.m., MPD Detective Sergeant Stuart Whitman responded to the scene at 114 West Muncey Street. Detective Whitman confirmed that there was a blood trail between where the victim was found and 114 West Muncey Street; photographs of the blood were admitted into evidence. When Detective Whitman arrived, officers were "banging on" the front and back doors at 114 West Muncey Street to no avail. Detective Whitman learned that the apartment was leased to Ms. McKinney and that Defendant "was known to stay there" despite not being on the lease and having been banned from West Riverside. Officers obtained a search warrant for the apartment which Detective Whitman assisted in executing.

Detective Whitman recorded a video starting with the scene outside 114 West Muncey Street, showing each piece of evidence, and then following the blood trail until it ended where the victim was found; the video was entered into evidence. The video showed a pair of brown flip flops, "a tire track in the grass[,]" a wooden stick that appeared to be "part of a chair arm or chair leg[,]" and a broken off piece of shrubbery in the front yard of 114 West Muncey Street; photographs of the scene and each of the items were admitted into evidence. A cell phone was found in the backyard of 114 West Muncey Street. The cell phone rang while Detective Whitman was recording the video; the screen cannot be seen due to glare from a flashlight, but Detective Whitman can be heard saying the phone call was from "Madison." He denied that any blood was found on the front porch or on the sidewalk leading away from the front porch.

During the execution of the search warrant, officers found a "spent" Winchester 9-millimeter shell casing lying "in the threshold of 114 West Muncey Street at the front door." Officers found Defendant's ID in the living room, a plastic bag of Winchester 9-millimeter bullets on the bed, and Defendant's credit card on a nightstand in the only bedroom. There was chicken in a frying pan in the kitchen and it "was obvious someone had been cooking." There were no signs of a struggle in the apartment.

Officers were unable to locate Defendant on the night of the shooting. Detective Whitman attempted to locate Ms. McKinney, Madison Myers, and Anthony Mendez at Ms. Myers's apartment on the night of the shooting, but no one would answer the door. He also attempted to locate David Savage but was unsuccessful. Ms. McKinney was interviewed the day after the shooting. She confirmed that Defendant shot the victim. Approximately two days after the shooting, Detective Whitman interviewed Mr. Savage and encouraged Mr. Savage to try to get Defendant to turn himself in and asked Mr. Savage to contact him if Mr. Savage had contact with Defendant.

Detective Whitman interviewed Defendant at the Warren County Sheriff's Department on June 2, 2019, after Defendant was found at a residence in Shelbyville with Mr. Savage and taken into custody. After Detective Whitman read Defendant his *Miranda* rights, Defendant provided a statement. Defendant said that on the night of the shooting, Defendant was at 114 West Muncey Street with Ms. McKinney and Mr. Savage cooking dinner. He admitted shooting the victim and explained that he and the victim had "issues" because the victim told people that Defendant was selling drugs. Defendant had the gun for a "couple of months" before the shooting. He described the gun as a 9-millimeter semiautomatic handgun that was "missing the magazine" so it "could only fire one round through it" without being reloaded. Although Defendant gave two different accounts of what he did with the gun, Detective Whitman confirmed that the gun was never located. Defendant acknowledged that he was aware that the police were looking for him and he had cut his hair to avoid detection after seeing a picture of himself on the news.

Detective Whitman interviewed the victim on June 20, 2021, after the victim had been released from the hospital. During the interview, Detective Whitman photographed the surgical incision on the victim's abdomen and the bullet exit wound on the victim's back. He confirmed that he did not receive a projectile from the hospital because the bullet went through the victim's body.

On cross-examination, Detective Whitman confirmed that the only spent casing found was inside the front door frame at 114 West Muncey Street. It was his opinion that Defendant was "very close to the doorway" when he shot the victim. Detective Whitman also stated that when they looked at the lock screen of the cell phone found in the backyard of 114 West Muncey Street, there were Facebook messages from Mr. Mendez; a screenshot of the messages was entered into evidence. The first two messages were sent at 9:59 p.m. and read, "Hey Zoe Jesse is over here in the pjs" and "He's drunk asf[.]" There was then a forty-one-second Facebook call to Mr. Mendez, followed by another message from Mr. Mendez that read, "He said you know where he at lol his words."

Julius Clyde Hawkins testified that he lived at West Riverside and his backyard was joined with the backyard of 114 West Muncey Street. On May 27, 2019, he was sitting on

his back porch when he heard Defendant and "the white boy" cussing and then he heard a gunshot. Defendant ran "behind [Mr. Hawkins'] house across the railroad tracks and he threw his phone down and the cops got it." MPD Detective Tony Jenkins visited Mr. Hawkins in preparation for trial and "walked off and counted [forty-five] paces" between where Mr. Hawkins was at the time of the shooting and where the shooting occurred.

The State then rested its case, and the trial court denied Defendant's motion for judgment of acquittal.

Ms. McKinney testified for Defendant and stated that she had lived at 114 West Muncey Street for approximately three years prior to the shooting and that Defendant had lived there with her for about a year. On May 27, 2019, she was at her apartment with Defendant and Mr. Savage cooking chicken. She was about to walk outside to go to the neighbor's house to ask for butter when Defendant received a message from Mr. Mendez that the victim was "outside raising h*ll about wanting to fight." Ms. McKinney continued to the neighbor's house, and on her way she saw Mr. Mendez and the victim standing with a group of people. She was gone "less than two minutes."

As she was walking back from the neighbor's apartment, she heard the victim yell at Defendant wanting to fight. Defendant stood inside the apartment with the main door open, but the screen door closed and told her to hurry. Ms. McKinney saw something in the victim's hand that looked "like a bat or a stick of some sort" but she could not see the item clearly. Ms. McKinney attempted to stop the men from interacting and threw the tub of butter at the victim. The victim yelled at Ms. McKinney, and she and the victim "tussle[d]" for about fifteen seconds before her neighbor said something that distracted Ms. McKinney and the victim "got past" her. The victim moved toward the porch and threatened Defendant "[m]ore than three times." Then, she heard the screen door "slamming" as if Defendant and the victim were fighting over the door before she heard a gunshot. She confirmed that the victim was on the porch when he was shot. Defendant shut and locked the main door.

Ms. McKinney described the victim's behavior as "[i]rate" and "[d]ramatic[]." She confirmed that he appeared heavily intoxicated and she could smell alcohol on his breath. Ms. McKinney acknowledged that Defendant had been drinking that night but denied that Defendant yelled at the victim. Ms. McKinney "assume[d]" that Defendant was afraid of the victim based on the night of the shooting. She denied that Defendant left the apartment.

Ms. McKinney gave a statement to the police the next day. She said that she did not see the gun that night but had seen it previously. She described it as a black 9-millimeter pistol that did not have a "clip." Defendant bought the gun "[t]hree to four

weeks" before the shooting because "someone came to [their] house armed wanting to harm [them]."

On cross-examination, Ms. McKinney acknowledged that she and Mr. Mendez hid from police at Ms. Myers's apartment on the night of the shooting. She maintained that she did not see Defendant leave the apartment.

Mr. Savage testified that he was at 114 West Muncey Street with Defendant and Ms. McKinney on May 27, 2019. He recalled that Defendant seemed "worried" when Defendant received a text message regarding the victim. Mr. Savage was preparing food when the victim came to the door; Mr. Savage followed Defendant to the door. Mr. Savage described the victim as aggressive, drunk, and slurring his words. The victim argued with Defendant but Defendant did not argue back. The victim then argued with and pushed Ms. McKinney. According to Mr. Savage, the victim went on the porch "numerous times" and was "in violation of [Defendant]'s home." Mr. Savage heard a gunshot but did not see who was shot because he ran to avoid getting shot. Although he did not see the victim get shot, he knew that "when the incident occurred [the victim] was standing right there coming up on the porch." Mr. Savage denied that Defendant ever left the apartment or stepped onto the porch.

Defendant then rested his case. Based on the above evidence, the jury found Defendant guilty of attempted voluntary manslaughter as a lesser-included offense in count one and aggravated assault as charged in counts two and three. The jury found Defendant not guilty of employing a firearm during the attempt to commit a dangerous felony in count four.

In a bifurcated proceeding regarding count five,[3] Defendant testified that he had purchased the gun he used to shoot the victim a few months prior to May 27. He explained that he bought the gun for protection after two men tried to break into his and Ms. McKinney's apartment. The jury found Defendant guilty as charged in count five.

*Sentencing*

At the September 22, 2021 sentencing hearing, Defendant's presentence report was entered into evidence. It reflected that Defendant had four felony and twenty-five misdemeanor convictions and included as attachments some judgments of conviction. The

---

[3] The trial court denied Defendant's pretrial motion to bifurcate. It is unclear from the record when and why the trial court later decided to conduct a bifurcated trial.

presentence report did not contain a validated risk and needs assessment because Defendant declined to complete the assessment based on the advice of his attorney.

The State requested sentences "at the high end for all of these offenses." Regarding consecutive sentencing, the State acknowledged that it was "on pretty shaky ground[.]" It noted that Defendant had an extensive criminal history and acted with "complete disregard" for not only the victim, but all other people present at the apartment complex.

Defendant argued that counts one, two, and three should merge because "[a]ll three of these convictions are encompassed by the single act of [Defendant] shooting [the victim]." Defense counsel further stated "with equal candor" that "there [was] a statutory component" that required count five be served consecutively to counts one through three.

Defendant provided an unsworn statement to the court in which he expressed remorse for his actions. He stated, "At the end of the day, I'm glad that [the victim] is still alive and can still be a father, husband, and son."

The trial court found that Defendant was a Range II offender for counts one through three, and a Range I offender for count five. It applied enhancement factor one, that Defendant had a history of criminal conduct, based on finding that Defendant had a substantial criminal history and his previous history on supervised release was "not-so-stellar." In discussing enhancement factor ten, that Defendant "had no hesitation about committing a crime when the risk to human life was high[,]" the court stated that the risk to human life was high but that Defendant "[s]eemed to hesitate a lot." The trial court considered that the victim "came to where [Defendant] was as somewhat of a mitigating factor." The trial court did not address Defendant's merger argument.

Regarding alignment of sentences, the trial court stated that counts one, two, and three would run concurrently but "the possession of a firearm by a convicted felon *would have to run consecutively* to those." It imposed concurrent sentences of six years for count one and eight years for counts two and three, and a consecutive twelve-year sentence for count five, for an effective twenty-year sentence in the Tennessee Department of Correction. Defendant filed a timely motion for new trial, which was denied by written order on July 22, 2024.[4] Defendant's timely appeal is now before this court.[5]

---

[4] It appears based on the order denying Defendant's motion for new trial that a hearing was held on March 23, 2022; however, the record does not contain a transcript of this hearing. Additionally, the record does not indicate the cause of the delay between the filing of the motion for new trial, the hearing on the motion, and the entry of the trial court's written order.

[5] On July 15, 2024, Defendant filed a pro se request to waive the timely filing requirement which this court granted on July 24, 2024. We note that Defendant's request was filed prior to the trial court's order

## Analysis[6]

### I. Venue

Defendant argues that the evidence failed to establish that the offenses were committed in Warren County. The State asserts that Defendant has waived this challenge for failing to include it in his motion for new trial. Alternatively, the State argues that the evidence sufficiently proved by a preponderance of the evidence that the offenses occurred in Warren County. We agree with the State.

Under the Tennessee Constitution, all criminal defendants have the right to be tried "by an impartial jury of the County in which the crime shall have been committed[.]" Tenn. Const. art. 1 § 9; *see also* Tenn. R. Crim. P. 18(a). The State must prove venue by a preponderance of the evidence. T.C.A. § 39-11-201(e). Venue may be established by direct or circumstantial evidence and even "slight evidence is enough to carry the burden if it is uncontradicted." *State v. Haven*, No. W2018-01204-CCA-R3-CD, 2020 WL 3410242, at *6 (Tenn. Crim. App. June 19, 2020) (citing *Ellis v. Carlton*, 986 S.W.2d 600, 602 (Tenn. Crim. App. 1998)). Whether venue has been proven by a preponderance of the evidence is a question for the jury and the jury may "draw reasonable inferences based on the evidence presented." *State v. Trusty*, 326 S.W.3d 582, 597 (Tenn. Crim. App. 2010). Further, pursuant to Tennessee Rule of Evidence 201, a jury may, whether requested or not, take notice of facts "generally known within the territorial jurisdiction of the trial court." *See State v. Derring*, No. W2017-02290-CCA-R3-CD, 2019 WL 244471, at *4 (Tenn. Crim. App. Jan. 16, 2019) (quoting *State v. Ellis*, 89 S.W.3d 584, 598 (Tenn. Crim. App. 2000)).

First, we must determine whether venue is required to be raised in a motion for new trial in order to preserve the issue for appellate review. In *State v. Hutcherson*, our supreme court granted review to determine "whether the prosecution's failure to prove venue requires dismissal, where venue is not established in another jurisdiction, or whether the case may be remanded for retrial." 790 S.W.2d 532, 532 (Tenn. 1990). The supreme court reasoned that failure to establish venue is a trial error that "has nothing . . . to do with the guilt or innocence of a defendant." *Id.* at 535. Because "the Double Jeopardy Clause does not preclude retrying a defendant whose conviction is set aside because of an *error in the proceedings*[,]" such as failing to prove venue, the proper remedy is retrial, not dismissal. *Id.* The supreme court affirmed this court's holding that venue was not established, but reversed its dismissal of the case, and remanded the case to the trial court for retrial. *Id.*

denying the motion for new trial, and thus, was timely filed regardless of this court's July 24 order. *See* Tenn. R. App. P. 4(a), (d).

[6] We have reordered Defendant's issues for clarity.

Seven years later, this court in *State v. Anderson* held that a defendant did not waive his venue challenge by failing to raise it in a motion for new trial because "a successful appeal of an issue concerning venue would result in the dismissal of the prosecution." 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997). The *Anderson* opinion made no reference to *Hutcherson*. While *Hutcherson* and *Anderson* presented slightly different issues, the *Anderson* court's holding that dismissal is the proper remedy contradicted the *Hutcherson* court's holding that retrial is the proper remedy.

Since the *Anderson* decision, there has been a split of opinion among different panels of this court regarding whether a challenge to venue is waived for failure to include it in a motion for new trial. *Contrast State v. Fleming*, No. W2016-01017-CCA-R3-CD, 2018 WL 1762208, at *6 (Tenn. Crim. App. Apr. 12, 2018) (finding venue challenge waived for failure to include it in a motion for new trial), *and State v. Boykin*, No. W2010-00719-CCA-R3-CD, 2011 WL 4449671, at *7 (Tenn. Crim. App. Sept. 26, 2011) (same), *with Derring*, 2019 WL 244471, at *3 (relying on *Anderson* to find that the defendant's venue challenge was not waived for failure to include it in the motion for new trial), *and Haven*, 2020 WL 3410242, at *6 (same). Because *Hutcherson* is precedent from our supreme court and we see no indication that *Hutcherson* has been subsequently abrogated or overruled, we are bound by our supreme court's decision in *Hutcherson*.

Thus, since failure to raise venue is a trial error and the remedy is remand, not dismissal, venue must be raised in a motion for new trial to be preserved for appellate review. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial[.]"). To have properly preserved this issue for appeal, Defendant was required to raise it in his motion for new trial.

In response to the State's waiver argument, Defendant first argues that he properly preserved his venue challenge because "the motion [for new trial] recited the ground of insufficient evidence, and in Tennessee, venue is part of that insufficiency." Defendant cites no authority for this assertion. To the contrary, this court has held that venue is not an essential element of any crime and thus, it "is not an issue that may be properly reviewed pursuant to a sufficiency of the evidence challenge." *Fleming*, 2018 WL 1762208, at *6 (quoting *Boykin*, 2011 WL 4449671, at *7).

Defendant next asserts that venue is jurisdictional and may not be waived. We disagree. This court has found waiver of venue in multiple circumstances, including when not raised in a motion for new trial. *Boykin*, 2011 WL 4449671, at *7; *Fleming*, 2018 WL 1762208, at *6; *Carlton*, 986 S.W.2d at 601 (collecting cases finding waiver of venue). "Obviously, if venue could not be waived, a defendant's request for a change of venue

- 11 -

could never be granted." *Carlton*, 936 S.W.2d at 601. Defendant has waived consideration of this issue for failing to raise it in in his motion for new trial.

Waiver notwithstanding, the record supports the jury's finding that the State proved venue by the preponderance of the evidence. Defendant, relying on *Hutcherson*, argues that that "the mere fact that Warren County authorities investigated the crime cannot prove venue." *See Hutcherson*, 790 S.W.2d at 533. In *Hutcherson*, there was a dispute regarding the precise location of the crimes and the only evidence of venue was "that the mother of the victim called the Shelby County Sheriff's Office to report the crime and that office conducted an investigation." *Id.* We find *Hutcherson* easily distinguishable because in this case there is far more circumstantial evidence that the offenses occurred in Warren County. There is no dispute that the offenses occurred at 114 West Muncey Street. Thus, unlike *Hutcherson*, the location of the offenses is not in dispute. Rather, the question is whether the preponderance of the evidence showed that 114 West Muncey Street was within Warren County.

Here, the evidence clearly established that the offenses occurred in McMinnville. It is undisputed that the shooting occurred at 114 West Muncey Street and the victim was found outside of 104 Lyndon Street. Officer Starkey confirmed that both 114 West Muncey Street and 104 Lyndon Street were part of West Riverside which was a McMinnville Housing Authority property. Each officer who testified was employed by either MPD or McMinnville Housing Authority. *See Derring*, 2019 WL 244471, at *4 (affirming proof of venue in Shelby County because the location of the robbery was within Memphis Police Department's jurisdiction, each of the responding officers were employed with Memphis Police Department or Memphis Housing Authority, and testimony included relevant street names). After the shooting, the victim was "transported from Warren County to Erlanger Hospital." When Defendant was apprehended a few days after the shooting, he was interviewed by Detective Sergeant Whitman at the Warren County Sheriff's Department. Further, as acknowledged by defense counsel at oral argument, Defendant's trial was conducted at the Warren County Courthouse in McMinnville. The jury in this case, comprised of citizens of Warren County, could take notice that McMinnville was located within Warren County. *See Ellis*, 89 S.W.3d at 589 (citing *State v. Walden*, No. 03C01-9409-CR-00330, 1995 WL 506036, at *3 (Tenn. Crim. App. Aug. 17, 1999)); *see* Tenn. R. Evid. 201.

Importantly, the record reveals no evidence or allegation that the offenses occurred in any other county. *See id.*; *Cooper v. State*, No. E2022-01776-CCA-R3-PC, 2024 WL 4143828, at *44-46 (Tenn. Crim. App. Sept. 11, 2024) (discussing in post-conviction context that there was no evidence that the offenses occurred in a county other than Knox), *perm. app. denied* (Tenn. Mar. 14, 2025). In his reply brief, Defendant argues that cities and properties within those cities can occupy more than one county. However, Defendant

- 12 -

did not argue this point to the jury and has presented no evidence that such is the case for McMinnville and West Riverside.

Finally, the trial court instructed the jury that the State was required to prove by the preponderance of the evidence that the offenses occurred within Warren County and that failure to do so must result in a verdict of not guilty. The jury is presumed to follow the trial court's instructions and Defendant has provided no argument or evidence that the jury did otherwise. *Henley v. State*, 960 S.W.2d 572, 581 (Tenn. 1997).

Defendant is not entitled to relief.

## II. Consecutive Sentencing

Defendant argues that the trial court committed plain error when it aligned the count five firearm conviction consecutively to counts one through three based on defense counsel's erroneous assertion that it was statutorily required to be served consecutively. The State asserts that Defendant has not established that consideration is necessary to do substantial justice; it does not contest any of the other plain error factors. Alternatively, the State asserts that the record is sufficient for this court to conduct a de novo review of the trial court's sentencing decision. We agree with Defendant that the trial court erred by imposing partial consecutive sentencing.

Defendant concedes that he is limited to plain error review because he invited the error when trial counsel incorrectly advised the trial court that consecutive sentencing was statutorily mandated. *See* Tenn. R. App. P. 36(a), Advisory Comm. Comment ("The last sentence of this rule is a statement of the accepted principle that a party is not entitled to relief if the party invited error[.]"). To be entitled to plain error relief, a defendant must establish five requirements:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Worley*, No. M2023-00867-CCA-R3-CD, 2025 WL 101656, at *12 (Tenn. Crim. App. Jan. 15, 2025) (quoting *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000)), *perm. app. pending*. Because this court will only grant plain error relief when all five factors have been established, we need not consider all factors if it is clear from the record that at least one factor cannot be established. *Smith*, 24 S.W.3d at 283. Plain error relief should be "sparingly exercised." *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007). Thus, plain

error relief is only warranted when the error was "of such a great magnitude that it probably changed the outcome of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994) (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

Here, the record clearly establishes what occurred in the trial court. During argument at the sentencing hearing, defense counsel, in an effort to be candid with the trial court, stated that he believed that count five was statutorily required to be served consecutively to the other offenses. In its ruling, the trial court agreed with defense counsel, finding that "the possession of a firearm by a convicted felon would have to run consecutively" to the other counts. It made no other findings for its imposition of consecutive sentencing.

Next, a clear and unequivocal rule of law was breached. When a defendant is convicted of one or more offenses, the trial court has discretion to decide whether to align the sentences concurrently or consecutively. T.C.A. § 40-35-115(a); Tenn. R. Crim. P. 32(c). However, there are circumstances where consecutive sentencing is mandated by statute. For example, a sentence for employment of a firearm during the commission of a dangerous felony must be served consecutively to the sentence for the underlying dangerous felony. T.C.A. § 39-17-1324(e). When not statutorily mandated, a trial court may impose consecutive sentences if it finds by a preponderance of the evidence that a defendant fits into one of the seven enumerated categories in Tennessee Code Annotated section 40-35-115(b). So long as a trial court places adequate findings on the record to support its imposition of consecutive sentences, this court reviews the decision for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (citing *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) and *State v. Caudle*, 388 S.W.3d 273, 278 (Tenn. 2012)). However, when a trial court fails to provide adequate reasons on the record to support imposition of consecutive sentences, this court has "two options: (1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Id.* at 863-64.

The trial court did not cite authority for its belief that the count five firearm conviction was required to be served consecutively to the other convictions. Defendant was charged in count four with violating Tennessee Code Annotated section 39-17-1324(b), employing a firearm during the commission of a dangerous felony. The jury acquitted Defendant of that count. Defendant was charged and convicted in count five of possession of a firearm by a convicted felon, a conviction which is not required to be served consecutively. T.C.A. § 39-17-1307(b)(1)(a). It appears that defense counsel and the trial court confused the requirements of the two firearm statutes.

As for the fourth factor, it is clear from the record that Defendant did not waive the issue for tactical reasons but rather the issue was borne out of trial counsel's misinformed effort to be candid with the trial court. *See Smith*, 24 S.W.3d at 284 n.9 (stating that "plain error cannot be used to second-guess the deliberate decision of trial court" so the issue becomes whether the action "was the result of a deliberate, tactical decision").

Finally, a substantial right of the accused was affected, and consideration of the issue is necessary to do substantial justice. To make this showing, Defendant must prove that the trial court's erroneous belief that consecutive sentencing was statutorily required "affected the outcome of the trial court proceedings." *State v. Rimmer*, 623 S.W.3d 235, 278 (Tenn. 2021); *State v. Majors*, 318 S.W.3d 850, 864 (Tenn. 2010) (quoting *Smith*, 24 S.W.3d at 282-83 (explaining that substantial justice is at stake when "the error was so significant that it 'probably changed the outcome of the trial'"). Upon our review of the record, it appears that the trial court imposed consecutive sentencing based solely on the incorrect belief that consecutive sentencing was statutorily mandated. This mistaken belief added twelve years to Defendant's effective sentence.

The State asserts that Defendant has not proven that the trial court would have imposed concurrent sentencing if not for the mistaken belief that consecutive sentencing was mandatory and that the trial court likely would have imposed discretionary consecutive sentencing. It argues that the trial court "applied two enhancement factors that overlap with two consecutive sentencing factors," namely consecutive sentencing based on extensive criminal history and that Defendant is a dangerous offender. *See* T.C.A. §§ 40-35-114(1), (10) (enhancement factors); 40-35-115(b)(2), (4) (consecutive sentencing). The State acknowledges that to have properly imposed consecutive sentencing based on the dangerous offender classification, the trial court would have to make additional findings under *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995).

Here, despite the State's argument for imposition of consecutive sentencing based on the dangerous offender classification, the trial court made no findings to support this ground. *See* T.C.A. § 40-35-115(b)(4) (allowing consecutive sentencing when the trial court finds that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life *and* no hesitation about committing a crime in which the risk to human life is high" (emphasis added)). In fact, the trial court explicitly found that Defendant "[s]eemed to hesitate a lot" when discussing enhancement factors. Further, the trial court's application of enhancement factor one based on Defendant's criminal history does not necessarily mean that it would have found consecutive sentencing appropriate in addition to enhancement within the applicable sentencing range.

We conclude that the trial court committed plain error in imposing consecutive sentencing based on the erroneous belief that it was statutorily required to do so and without

making any findings regarding the discretionary consecutive sentencing grounds to support its decision. Although the State asserts that the record is adequately developed for this court to conduct a de novo review, the decision to impose discretionary consecutive sentencing is a highly fact-intensive inquiry and the trial court is in the best position to make such inquiries. Therefore, we reverse the imposition of partial consecutive sentences and remand the case to the trial court for a new sentencing hearing for count five.

### III.     Merger of Aggravated Assault Convictions

Defendant argues that the trial court erred by not merging his aggravated assault convictions. The State concedes that the convictions must merge.

Both the United States and Tennessee constitutions provide protections against being prosecuted or punished twice for the same conduct. In certain circumstances, these protections require that "two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications." *State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015). When double jeopardy concerns are implicated in a single prosecution:

> "multiple punishment" challenges ordinarily fall into one of two categories: unit-of-prosecution claims and multiple description claims. Unit-of-prosecution claims arise when a defendant has been convicted of multiple violations of the same statute. Multiple description claims arise when a defendant has been convicted of multiple criminal offenses under different statutes.

*State v. Allison*, 618 S.W.3d 24, 43 (Tenn. 2021) (citing *State v. Watkins*, 362 S.W.3d 530, 543-44 (Tenn. 2012)). This court reviews whether multiple convictions violate double jeopardy de novo with no presumption of correctness. *Watkins*, 362 S.W.3d at 539.

Here, Defendant was charged and convicted in count two with assault resulting in serious bodily injury and in count three with assault involving the use or display of a deadly weapon. *See* T.C.A. § 39-13-102(a)(1)(A)(i), (iii) (defining aggravated assault as assault that results in serious bodily injury or involved the use or display of a deadly weapon). Both convictions were based on the same criminal conduct – Defendant's shooting the victim in the abdomen. "Even though the elements of the two types of aggravated assault are distinct, there is still only one assault and one victim." *State v. Beard*, No.W2013-00502-CCA-MR3-CD, 2014 WL 5465860, at *4-5 (Tenn. Crim. App. Oct. 28, 2014); *see State v. Baxter*, No. M2016-00049-CCA-R3-CD, 2016 WL 5831616, at *3 (Tenn. Crim. App. Sept. 30, 2016) (concluding that the three separate convictions for aggravated assault based on serious bodily injury, strangulation, and violation of court order were "based on the same occurrence and were indicted as alternative theories of the same offense").

- 16 -

Because both convictions stem from the same criminal conduct, double jeopardy principles require merger of the convictions. Thus, we remand for merger of counts two and three and for entry of corrected judgments reflecting a single conviction for aggravated assault.

## CONCLUSION

We conclude that Defendant waived his complaint that venue was not properly established but that the record supports the jury's finding that venue was proven by a preponderance of the evidence. However, we also conclude that the trial court erred by ordering count five to be served consecutively and by failing to merge counts two and three into a single conviction. Accordingly, we remand the case to the trial court for a new sentencing hearing for count five and for merger of counts two and three. We affirm the judgments of the trial court in all other respects.

s/ *Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE